**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
TACOMA DIVISION**

| | |
|---|---|
| **OBRIA GROUP, INC., and MY CHOICES d/b/a OBRIA MEDICAL CLINICS PNW**, | Civil No.: 3:23-cv-06093-TMC |
| *Plaintiffs,* | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION AND BRIEF IN OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| **ROBERT FERGUSON**, in his official capacity as Attorney General for the State of Washington, | NOTE ON MOTION CALENDAR: |
| | **October 7, 2024** |
| *Defendant.* | ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................. 4

    A.    The Obria Clinics serve Washington women and men. ....................... 4

    B.    The Attorney General publicly opposes pregnancy centers ................ 5

    C.    The Attorney General serves CIDs and deficiency letters. ................ 7

    D.    The Obria Clinics sue and the Attorney General denies harm. ............ 8

    E.    The CIDs cause an increase in Obria PNW's insurance premium ......... 8

    F.    The Attorney General drops his investigation and any litigation. ........ 9

ARGUMENT ................................................................................... 9

I.    The Obria Clinics' standing is beyond reasonable dispute. ............................. 9

    A.    Obria PNW's insurance premium increase establishes standing. ....... 10

    B.    The Attorney General's enforcement efforts establish standing. ......... 14

        1.    The Attorney General has threatened enforcement. ................. 15

        2.    Past enforcement of CIDs supports standing. ............................ 18

    C.    The Attorney General inflicted multiple constitutional harms. ........... 18

        1.    Harm to the Obria Clinics' associational freedom. ................... 19

        2.    Harm to the Obria Clinics' freedom of expression. ................... 20

        3.    Harm to the Obria Clinics' Fourth Amendment rights ............. 22

II.    The undisputed facts entitle the Obria Clinics to summary judgment. ......... 23

    A.    The Attorney General does not try to meet exacting scrutiny. ............ 24

    B.    The Attorney General has not met his burden as to retaliation. ......... 27

        1.    The Obria Clinics have proven the elements of retaliation. ....... 27

PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN OPPOSITION
TO MOTION TO DISMISS

i

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

2.    The Attorney General has not met his burden............................ 29

C.    The Attorney General fails his Fourth Amendment burden. ............... 31

III.    The Obria Clinics are entitled to a permanent injunction. ............................ 33

CONCLUSION.................................................................................................................. 35

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

ii

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

# TABLE OF AUTHORITIES

## Cases

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*,
No. 2:16-CV-00750-CB, 2018 WL 1660743 (W.D. Pa. Mar. 21, 2018) .................. 12

*American Beverage Association v. City & County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ................................................ 34

*Americans for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ................................................... passim

*Arizona Right to Life Political Action Committee v. Bayless*,
320 F.3d 1002 (9th Cir. 2003) ................................................ 19

*Block v. Meese*,
793 F.2d 1303 (D.C. Cir. 1986) ................................................ 12

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) ............................................... 2, 27

*Brock v. Local 375, Plumbers International Union of America, AFL-CIO*,
860 F.2d 346 (9th Cir. 1988) ................................................ 24

*Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*,
860 F. App'x 542 (9th Cir. 2021) ........................................... 2, 10

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................... 23

*Consumer Finance Protection Bureau v. Accrediting Council for Independent Collseges & Schools*,
854 F.3d 683 (D.C. Cir. 2017) ................................................ 31

*Department of Commerce v. New York*,
588 U.S. 752 (2019) .................................................... 1, 12

*Dole v. Service Employees Union, AFL-CIO, Local 280*,
950 F.2d 1456 (9th Cir. 1991 ................................................ 20

*Duke Power Co. v. Carolina Environmental Study Group., Inc.*,
438 U.S. 59 (1978) ....................................................... 13

*Elrod v. Burns*,
427 U.S. 347 (1976) ...................................................... 33

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

iii

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*FBI v. Fikre,*
 601 U.S. 234 (2024) ................................................................ 13, 18

*Frederick Douglass Foundation, Inc. v. District of Columbia,*
 82 F.4th 1122, (D.C. Cir. 2023) ........................... 2, 4, 29, 30

*FTC v. American Tobacco Co.,*
 264 U.S. 298 (1924) ........................................................... 31, 32

*In re Express Scripts, Inc., Pharmacy Benefits Management Litigation,*
 No. MDL 1672, 2007 WL 1796224 (E.D. Mo. June 20, 2007) .............................. 12

*In re McVane,*
 44 F.3d 1127 (2d Cir. 1995) ................................................... 31

*John Doe No. 1 v. Reed,*
 561 U.S. 186 (2010) ................................................................ 24

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.,*
 762 F.3d 867 (9th Cir. 2014) .................................................. 33

*Larson v. Valente,*
 456 U.S. 228 (1982) ............................................................... 13

*Lyall v. City of Los Angeles,*
 807 F.3d 1178 (9th Cir. 2015) ............................................... 23

*Major League Baseball v. Crist,*
 331 F.3d 1177 (11th Cir. 2003) .................................... 2, 22, 31

*Matter of Confidential Consumer Protection Investigation,*
 512 P.3d 904 (Wash. App. Div. 3, 2021) .............................. 18

*McElyea v. Babbitt,*
 833 F.2d 196 (9th Cir. 1987) ................................................. 23

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ................................................. 23

*NAACP v. Alabama ex rel. Patterson,*
 357 U.S. 449, (1958) ................................................... 20, 25, 26

*National Institute for Family & Life Advocates v. James,*
 No. 1:24-cv-514, 2024 WL 3904870 (W.D.N.Y. Aug. 22, 2024) .................... passim

*NRA v. Vullo,*
 602 U.S. 175 (2024) ........................................... 3, 29, 30, 31

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

iv

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*O'Brien v. Welty,*
    818 F.3d 920 (9th Cir. 2016) ......................................................... 23, 27

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2010) ...................................................... passim

*Resolution Trust Corporation v. Walde,*
    18 F.3d 943 (D.C. Cir. 1994) ............................................................. 31

*Savage v. Glendale Union High School, Dist. No. 205, Maricopa County,*
    343 F.3d 1036 (9th Cir. 2003) .............................................................. 9

*Seattle Pacific University v. Ferguson,*
    104 F.4th 50 (9th Cir. 2024) ..................................................... 2, 17, 18

*Smith & Wesson Brands, Inc. v. Attorney General of New Jersey,*
    27 F.4th 886 (3d Cir. 2022 ........................................................... 3, 21

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ......................................................................... 17

*T.W. Electric Service, Inc. v. Pacific Electric Contractors Association,*
    809 F.2d 626 (9th Cir. 1987) .............................................................. 23

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ....................................................... 18, 19

*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ...................................................... passim

*Union Gospel Mission of Yakima v. Ferguson,*
    No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) ...................... 2

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021) ....................................................................... 13

*Washington v. Brelvis Consulting LLC,*
    436 P.3d 818 (Wash Ct. App. 2018), *amended on reconsideration* (Mar. 12, 2019) ......................................................................................... 16, 18

*Washington v. TVI, Inc.,*
    524 P.3d 622 (Wash. 2023) ................................................................ 18

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ............................................................ 17

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

v

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*WildEarth Guardians v. U.S. Forest Service,*
  70 F.4th 1212 (9th Cir. 2023) ................................................................. 11

*Withey v. Federal Bureau of Investigation,*
  477 F. Supp. 3d 1167 (W.D. Wash. 2020) ....................................... 23, 26

**Statutes**

RCW 19.86.110 ......................................................................................... 15, 20

**Rules**

Fed. R. Civ. P. 56 ............................................................................................ 22

Wash. Civ. P. R. 37 ................................................................................... 15, 20

**Other Authorities**

Washington State, Office of the Attorney General, Reproductive Rights
  Complaint Form, https://bit.ly/4dAs2vN. ................................................. 5

Planned Parenthood, *Crisis Pregnancy Centers: What to Know and How to
  Spot Them* (Nov. 4, 2021), https://bit.ly/3XiPEPF. .................................. 6

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

vi

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

## INTRODUCTION

The Attorney General has painted himself into a corner. For months, and up through the hearing on the Obria Clinics' motion for preliminary injunction, he insisted this constitutional challenge to his investigation was a case about nothing and that the Court lacked jurisdiction to decide it. He continued in that posture when the Obria Clinics sought to file a supplemental complaint to detail the increased insurance cost Obria PNW expected to face from his unconstitutional investigation. But when Obria PNW sought to plead further facts quantifying the increase in its premium—a nearly five-fold jump—he changed course. In an apparent attempt to moot the case, he issued a letter stating that his investigation was closed and that he would not institute any litigation against the Obria Clinics. Ex. A to Stipulated & Proposed Order, ECF No. 38-1 ("Closure Letter"). And he said he was issuing this letter, against the official policy of his office, "to provide [the Obria Clinics] with a statement they can offer to their insurer, which will provide certainty as to the status of this investigation." *Id.*

Now the Attorney General appears to regret having sent the letter. He realizes too late that his voluntary cessation of wrongful conduct cannot moot the case, so he does not even argue mootness. Instead, he continues to insist that the Obria Clinics lack standing, though the statements in his closure letter foreclose his attempt to do so. Indeed, by acknowledging that he had departed from his ordinary policy on closure letters so that Obria PNW would have something to give its insurer, the Attorney General established the very causal connection between his actions and insurance coverage that he now attempts to deny. On top of the Obria Clinics' enforcement and constitutional injuries, this premium hike is "the predictable effect of Government action on the decisions of third parties" as to which standing is well established. *Department of Com. v. New York*, 588 U.S. 752, 768 (2019). In fact, the Attorney General's attempt to defeat standing is so weak that he resorts to recharacterizing

PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND BRIEF IN OPPOSITION
TO MOTION TO DISMISS

1

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

Ninth Circuit decisions *against* him as cases in *support*. *Cedar Park Assembly of God of Kirkland, Washington v. Kreidler*, 860 F. App'x 542 (9th Cir. 2021) (unpublished); *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024) *("SPU")*; *see also Union Gospel Mission of Yakima v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024). But his own admissions doom his attempts to prevent the Court from deciding the Obria Clinics' claims. He cannot avoid federal jurisdiction.

On the merits, the record shows why he would want to escape a decision from this Court, since the Obria Clinics' claims are subject to burden shifting. Each of those claims assigns a burden of proof to the Attorney General that he has made no attempt to meet. For the Obria Clinics' claims about their First Amendment association rights and privilege, the Attorney General has not even tried to show that his demands for disclosure of their protected associations meet the "exacting scrutiny" standard set by the Supreme Court. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–07 (2021) (plurality op.). For the Obria Clinics' retaliation claims, he has not attempted to meet his burden to show that he would have served these demands even without Obria's protected pro-life speech. *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022). And for Obria's Fourth Amendment claims, he has not proffered any factual showing that he ever had any reason to think that Obria violated the Washington Consumer Protection Act. *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003). Much less has he shown a violation that would warrant him receiving any more documents than those Obria has already produced.

Rather than attempt to satisfy these burdens, the Attorney General does the same thing he attempts with his standing arguments: he tries to recast critical adverse decisions as supporting his position. But to no avail. *Perry v. Schwarzenegger* halted a similar attempt to compel disclosure of protected membership identities. 591 F.3d 1147, 1152 (9th Cir. 2010). *Frederick Douglass Foundation, Inc. v. District of Columbia* found unlawful action against protected speech in the same sort of

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

2

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1   disparate treatment that the Attorney General engaged in here. 82 F.4th 1122, 1138

2   (D.C. Cir. 2023). And the Supreme Court's unanimous decision last term in *NRA v.*

3   *Vullo* held that the same sort of public hostility the Attorney General has shown to

4   pregnancy centers is evidence that supports First Amendment claims. 602 U.S. 175,

5   194 (2024); *see also id.* at 204 (Jackson, J., concurring).

6       Because the record contains no evidence on elements as to which the Attorney

7   General has the burden of proof, the Obria Clinics are entitled to summary judgment.

8   Summary judgment should include final injunctive relief to ensure that the Attorney

9   General cannot renew his campaign of harassment against the Obria Clinics without

10  meeting the required constitutional showings. Even though the Attorney General

11  has—for now—dropped his investigation against the Obria Clinics and decided "not

12  to pursue litigation," he has emphasized "[n]o inference should be drawn" from his

13  decision to do so. *See* Closure Letter at 1. That limitation on the closure letter matters

14  particularly because the current Attorney General, Robert Ferguson, is not running

15  for re-election and will soon be replaced by another. And so without an injunction, the

16  Attorney General will be able to keep invoking an improper interpretation of his

17  consumer protection powers to chill protected speech and association with these

18  demands. "One might suspect that . . . the whole point" of serving these demands is

19  that, "fearing the arrival of subpoenas," actors will "think[] twice before speaking."

20  *Smith & Wesson Brands, Inc. v. Attorney Gen. of N.J.*, 27 F.4th 886, 896–97 (3d Cir.

21  2022) (Matey, J., concurring). That effect will continue unless this Court ends it.

22      The Attorney General's conduct here is part of a pattern, coordinated with the

23  other attorneys general who co-signed the same open letter condemning pregnancy

24  centers. Fraas Decl. Ex. A at 1, ECF No. 23-3 ("Open Letter"). Late last week, another

25  federal court enjoined a related campaign of hostility by New York's Attorney General

26  against pregnancy centers making the same speech targeted here. *See National Inst.*

27  *for Fam. & Life Advocs. v. James*, No. 1:24-cv-514, 2024 WL 3904870 (W.D.N.Y. Aug.

28  PLAINTIFFS' CONSOLIDATED BRIEF RE:
    MOTION TO DISMISS AND MOTION FOR
    SUMMARY JUDGMENT AND FINAL
    INJUNCTION

    3

    ALLIANCE DEFENDING FREEDOM
    440 First Street NW, Suite 600
    Washington, DC 20001
    (202) 393-8690

22, 2024) ("*NIFLA*"). This Court should likewise issue an injunction. If state officials can subject small nonprofits to such exorbitant threats and punishing compliance costs and then avoid federal scrutiny while he chills their speech, there is no telling which cause—or which side of the political aisle—will suffer next. The First Amendment exists to ensure that the government does "not enforce the laws in a manner that picks winners and losers in public debates," *Frederick Douglass*, 82 F.4th at 1142, and the need for free speech is most acute "in the fields of medicine and public health, where information can save lives." *NIFLA*, 2024 WL 3904870 at *10 (quotation omitted). So "[i]t would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law," like the CPA, "and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Frederick Douglass*, 82 F.4th at 1142.

The Court should enter final injunctive relief against the Office of Attorney General, whether run by Mr. Ferguson or his successor. Should the Attorney General wish to recommence investigation or litigation against the Obria Clinics, the injunction should require him to make the constitutional showings that he has so far ignored. The Court should deny the Attorney General's motion to dismiss, grant summary judgment, and enter the final injunctive relief in Obria's proposed order.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. The Obria Clinics serve Washington women and men.

The Obria Group is a national network of Christian pro-life pregnancy centers, and Obria PNW is a local affiliate that runs three medical clinics in Washington state. Third Suppl. Verified Compl. ¶¶ 2, 30, 44, 45 ("Suppl. Compl."). Together, the Obria Clinics are licensed health clinics that serve thousands of women and men every year. *Id.* ¶ 30. Under the direction of a Medical Director, the Clinics provide many of the same services as Planned Parenthood (but at no cost to any patient), including pregnancy testing, sexually transmitted disease and infection (STD/STI) testing,

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

4

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

ultrasounds, well-woman examinations, and cancer screenings. *Id.* ¶¶ 62, 65. But as pro-life organizations, the Clinics do not provide or refer for abortions. *Id.* ¶ 63(f). The Clinics do not currently provide abortion pill reversal (APR), a process that uses supplemental progesterone to counter the effects of the abortion drug mifepristone. *Id.* ¶ 69. Instead, the Clinics stand ready to refer women for the medication process if they have taken mifepristone and changed their mind about completing their abortion. *Id.* ¶ 68.

**B.  The Attorney General publicly opposes pregnancy centers.**

The Attorney General publicly opposes pregnancy centers like the Obria Clinics. Suppl. Compl. ¶¶ 80–100. He does so in several ways:

**Consumer Alert:** The Attorney General issued a consumer alert about reproductive healthcare that warns consumers against pregnancy centers. Consumer Alert, attached as Ex. A to Wilson Decl. The Attorney General's alert states that consumers should "[b]eware of clinics that claim to offer reproductive health care but refuse to perform abortions or give abortion referrals." *Id.* at 2. His alert also states that pregnancy centers may "provide incomplete, medically inaccurate information" but does not say what that information is. *Id.* And the alert states that "[t]hese clinics are not subject to HIPAA," *id.*, though the Obria Clinics are subject to HIPAA. Supp. Compl. ¶ 71. The Attorney General has issued no consumer alert about abortion clinics—instead, he refers consumers to lists of abortion clinics, including one maintained by the National Abortion Federation. Consumer Alert at 2.

**Complaint Form:** Through an online form, the Attorney General invites the public to report if they "[e]xperienced deception, harassment, or other misconduct at a . . . pregnancy center." Washington State, Office of the Attorney General, Reproductive Rights Complaint Form, https://bit.ly/4dAs2vN. The Attorney General has never during the pendency of this litigation identified any complaint received against the Obria Clinics. His complaint form is also one-sided: it does not offer any

1  option for consumers to complain about deception or misconduct by abortion clinics,

2  *see id.*, even though those clinics charge for their services.

3  **Open Letter:** The Attorney General joined an open letter with other state

4  attorneys general attacking pregnancy centers as they "have proliferated in [their]

5  states, outnumbering abortion clinics by a three-to-one ratio." *See* Open Letter at 1.

6  The first complaint in his letter is that pregnancy centers "do not provide abortions

7  or abortion services." *Id.* at 1. The letter then makes other criticisms of pregnancy

8  centers, including for purported misstatements about APR, and even complaints for

9  the way they have "commonly offered maternity and baby supplies." *Id.* at 1–2, 6. The

10 letter is supported by citations to pro-abortion advocates that characterize pregnancy

11 centers as "Designed to Deceive" and an "Insidious Threat to Reproductive Freedom."

12 *See id.* at 2 n.4, 3 n.16.  The letter cites the legal proceedings filed by the California

13 Attorney General against an affiliate of Obria, *id.* at 3 n.16, and it closes with a pledge

14 to "continue to take numerous actions aiming to mitigate the harmful effects of

15 [pregnancy centers'] misinformation." *Id.* at 8.

16 **Alliance with Planned Parenthood:** In contrast to his opposition to pro-life

17 pregnancy centers, the Attorney General has allied himself with Planned

18 Parenthood, a pro-abortion network of clinics that charges for its services. Suppl.

19 Compl. ¶¶ 83, 86. In 2019, the Attorney General said his office "worked very closely,

20 obviously, with Planned Parenthood" in abortion litigation. *Id.* ¶ 86. Planned

21 Parenthood calls him a "champion for abortion access" and "reproductive health." *Id.*

22 ¶ 92. He celebrated "Abortion Provider Appreciation Day" by participating in a forum

23 with Planned Parenthood, local abortion providers, and abortion advocates. *Id.* ¶ 94.

24 Notably, Planned Parenthood itself independently opposes pregnancy centers, which

25 it calls "fake clinics." *See* Planned Parenthood, *Crisis Pregnancy Centers: What to

26 Know and How to Spot Them* (Nov. 4, 2021), https://bit.ly/3XiPEPF.

27

28 PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

6

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

**C.     The Attorney General serves CIDs and deficiency letters.**

The Attorney General served civil investigative demands (CIDs) on the Obria Clinics under the Washington Consumer Protection Act (CPA). Suppl. Compl. ¶ 102. The CIDs state that the Attorney General is investigating "unfair or deceptive acts and practices . . . concerning services provided to Washington consumers, including . . . Abortion Pill Reversal," and "unfair acts or practices related to the collection and use of consumer data." *See* Ex. A to Mot. for Prelim. Inj. at 1, ECF No. 4-3 ("Obria PNW CIDs"); *accord* ECF No. 4-2 (substantially similar CIDs for Obria Group). The CIDs cite no basis for suspecting that the Obria clinics are involved in such violations. *See* Obria CIDs at 5. Nor has the Attorney General served Planned Parenthood with such CIDs, even though Planned Parenthood has a documented and public history of leaks and breaches of patient data. Suppl. Compl. ¶ 117.

The CIDs demand—from January 1, 2010 to the present—a wide variety of information from the Obria Clinics, including the following:

a. "relationships with any parent, affiliate, sister, licensee, franchisee, subsidiary, predecessor, or successor assignee(s)," Obria PNW CIDs at 10;

b. identities of every person who provided "accounting, book keeping, payroll, or tax preparation services," *id.* at 11;

c. all deposit and credit accounts, including the name of the institution, authorized signors, account numbers, *id.* at 11;

d. identities, dates of association, health profession licensures, duties, pay status, and any familial relationship of "all directors, officers, principals, agents, members, employees, contractors, and volunteers" associated with" the ministry, *id.* at 11;

e. "all notices, agendas, and MINUTES for every meeting of YOUR Board of Directors . . . YOUR Medical Advisory Board . . . and/or general meetings of YOUR executive and/or operations team(s) (and any subcommittees thereof)," *id.* at 19;

f. "copies of all tax forms and related schedules or attachments prepared for YOU or on YOUR behalf that are not publically [sic] available through the Internal Revenue Service's Tax Exempt Organization Search feature

PLAINTIFFS' CONSOLIDATED BRIEF re:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

7

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

(https://apps.irs.gov/app/eos/) during the Relevant Time Period"; *id.* at 20; and

g. "all DOCUMENTS relating to draft and final financial statements, balance sheets, general ledger(s), and other financial disclosures, from 2010 to the present, including, without limitation, documents and calculations relied upon in creating such documents and/or provided to auditors, lenders, grantors, and/or donors," Obria CIDs at 20.

The Obria Clinics conferred with the Attorney General about these responses and produced documents as requested, totaling about 1,500 pages. Suppl. Compl. ¶¶ 113, 116. But the Attorney General served deficiency letters deeming these responses inadequate and demanding "full and complete responses" to the CIDs. *Id.* ¶ 114; *see also* Deficiency Notices, ECF Nos. 4-11, 4-12.

### D.   The Obria Clinics sue and the Attorney General denies harm.

The Obria Clinics sued, seeking an injunction against enforcement of the CIDs. Along with their threats of sanctions, enforcement, and disclosure of documents, the CIDs had practical consequences for the Obria Clinics. As detailed below, the CIDs caused the Obria Clinics to chill their own speech about APR and damaged their relationships with mission-aligned vendors. Suppl. Compl. ¶ 120–22; Declaration of River Sussman, Feb. 12, 2024, ECF No. 25-1 ("First Sussman Decl.") ¶ 2–5.

The Attorney General denied that his actions had caused any cognizable harm and moved to dismiss. The Court heard argument on the Obria Clinics' motion for preliminary injunction and the Attorney General's motion to dismiss.

### E.   The CIDs cause an increase in Obria PNW's insurance premium.

After suing, Obria PNW had to disclose the CIDs it received in connection with its application to renew certain of its insurance policies. Suppl. Compl. ¶ 124. Obria PNW could not state in that application that the Defendant's investigation had concluded, that no adverse findings were made, or that no claim or enforcement action against it will ensue. *Id.* ¶ 125. Obria PNW then received notice from its insurance agency that, as a direct result of truthfully acknowledging the CIDs, the agency could

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

8

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

not secure an underwriter to renew and extend an essential insurance policy. *Id.* ¶ 126. Obria PNW's insurance agency ultimately obtained replacement coverage through a different underwriter, but, because of the pendency of the CIDs, it was at a cost vastly in excess of its prior policy. *See id.* ¶ 127. The Obria Clinics proffered these facts in proposed supplemental pleadings.

**F.      The Attorney General drops his investigation and any litigation.**

After the Obria Clinics provided a supplemental pleading alleging the increased insurance costs for Obria PNW, the Attorney General responded by sending the Clinics a letter stating that his office had decided "not to pursue litigation and to close its investigation." Closure Letter. The letter explained that while issuing such a letter was against the ordinary policy of his office, he was "making an exception in this instance to provide [the Obria Clinics] with a statement they can offer to their insurer, which will provide certainty as to the status of this investigation." *Id.* While the letter stated that the Attorney General had closed his investigation both as to Obria PNW and as to its vendors, "[n]o inference should be drawn" from his decision to do so. *Id.*

The Attorney General stated his intent to move to dismiss based on this letter, but opposed the Obria Clinics' proposal to simultaneously move for summary judgment. Stipulation and Proposed Order, ECF No. 41. The Court granted the Obria Clinics' proposal. Scheduling Order, ECF No.42.

## ARGUMENT

## I.      The Obria Clinics' standing is beyond reasonable dispute.

The Attorney General's attack on standing is a "factual" challenge that relies on "presenting affidavits or other evidence." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.,* 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). That means that the Obria Clinics "must furnish affidavits or other evidence necessary to satisfy [their] burden of establishing subject matter jurisdiction." *Id.* They have done so in

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

9

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

three ways. First, Obria PNW has suffered a present, concrete, and redressable harm that followed directly from the Attorney General's investigation: a jump in its insurance premiums. Second, the Obria Clinics have experienced a direct harm from receipt of the Attorney General's CIDs because Washington law imposes sanctions for non-compliance and he has not disavowed enforcement. And third, the Obria Clinics have experienced harm to their First and Fourth Amendment rights as a direct result of the Attorney General's unlawful actions.

### A. Obria PNW's insurance premium increase establishes standing.

Standing is clear from the increase in insurance premium that the Attorney General's investigation caused for Obria PNW. When Obria PNW had to disclose the pendency of the CIDs in connection with its application to renew its insurance coverage, its insurance agency notified it "that, as a direct result of truthfully acknowledging on its application that it is presently subject to Defendant's CIDs, the agency was unable to secure" renewal coverage. Suppl. Compl. ¶¶ 124–26; Declaration of River Sussman, Aug. 26, 2024 ("Second Sussman Decl.") ¶ 3. As a result, Obria PNW had to look for other coverage, which it ultimately obtained through a different underwriter, but at a cost almost five times as much. *See* Suppl. Compl. ¶ 128; Second Sussman Decl. ¶ 6. The Ninth Circuit has already recognized an Article III injury when state action has caused a loss of insurance coverage, *Cedar Park*, 860 F. App'x at 543, and the injury is even more clear where it is not just a loss of initial coverage, but an ongoing premium increase. That injury is directly traceable to the Attorney General's conduct and is likely to be redressed by a favorable decision in this case. An injunction against the Attorney General's enforcement of the CIDs would remove the CIDs as any valid basis for a premium increase. This alone establishes standing.

The Attorney General says that this theory of standing does not work because it hinges on actions of third parties and thus "Was Not Caused" and "Cannot Be

Redressed" by his office. Mot. to Dismiss Third Suppl. Compl. 11, ECF No. 44 ("MTD"). But his own closure letter establishes the very points he tries to deny. Whatever he may argue now, his letter shows what he believed: that "an exception" to his normal policy against closure letters was warranted so Obria PNW would have "a statement they can offer to their insurer" that "will provide certainty as to the status of this investigation." Closure Letter; *see also* Hearing Tr. 51, ECF No. 31. He sent that letter right after Obria PNW had filed a proposed supplemental complaint explaining that it had finally been able to obtain replacement coverage at an increased cost. Suppl. Compl. ¶ 128.  The undeniable purpose of trying to give the insurer notice of his "decision not to pursue litigation and to close its investigation" was so the insurer would lower Obria PNW's premium and thus erase its economic injury. Closure Letter. The Attorney General's own statements thus make it impossible for him to credibly deny causation and redressability.

The Attorney General distorts the law in arguing otherwise. He claims that for standing based on actions of a third party, the plaintiff "must generally show that the defendant exerted a 'determinative or coercive effect on the third-party conduct that directly cause[d] the injury.'" MTD at 12 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1217 (9th Cir. 2023)). But this misstates the caselaw by turning a *may* into a *must*. The *WildEarth* decision does not say that a plaintiff "must generally" show coercion to show standing in these circumstances, but only that "[a] plaintiff *can* do so by showing . . . a determinative or coercive effect on the third-party conduct." 70 F.4th at 1217 (emphasis added) (cleaned up). Under Ninth Circuit law, coercion is not a required element of standing based on third-party conduct, just one option for showing it.

The Attorney General does not mention the actual test for causation from Supreme Court jurisprudence: whether the harm from the third party is "the predictable effect of Government action on the decisions of third parties." *Department*

PLAINTIFFS' CONSOLIDATED BRIEF re:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

11

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*of Com.*, 588 U.S. at 768. There is no doubt about predictability here: an increase in insurance premiums is a natural and expected consequence of the government's decision to investigate an entity, since that investigation is a source of additional exposure and risk to the insurer. Other courts have recognized standing when the defendant's actions were alleged to have caused insurers to increase the plaintiff's insurance premiums. *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, No. 2:16-CV-00750-CB, 2018 WL 1660743, at *4 (W.D. Pa. Mar. 21, 2018) ("[B]ut for the Flex Defendant's defective design of the Pro-Flex CSST, Bayberry North and Betters Real Estate would not have had to replace the CSST, would not have suffered a diminution in property value and increased insurance premiums."), *adopted,* 2018 WL 1640368 (W.D. Pa. Apr. 5, 2018); *In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, No. MDL 1672, 2007 WL 1796224, at *3 (E.D. Mo. June 20, 2007) ("Plaintiffs have established Article III standing" based on allegations of "inflated premiums . . . traceable to ESI's actions."). This case is no different.

Plus, Article III ultimately "'requires no more than de facto causality.'" *Department of Com.*, 588 U.S. at 768. (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). The record here shows cause in fact. Obria PNW's insurance agent specifically stated that the underwriter had refused to renew coverage because of the Attorney General's investigation. Second Sussman Decl. ¶¶ 3–7. Obria PNW had disclosed that investigation in its renewal application and the insurer specifically asked about it. *Id.* ¶¶ 3–4. But the insurer denied both the renewal and any request for reconsideration, explaining that it had done so "[d]ue to the claims" and because of Obria PNW's disclosure of "circumstances that could lead to a claim." *Id.* ¶¶ 4–5. The insurer made that point even more clear by explaining that renewal would require an amended application showing both "no claims" and a "result of no wrong doing" from the Attorney General's investigation. *Id.* ¶ 6. Because Obria PNW could not make that showing—not even by disclosing the status of this

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

12

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

case after the preliminary injunction hearing—its insurer refused renewal. *Id*. The message its insurer relayed was unambiguous: "recent civil investigative demand by the attorney general we will have to stick with our declination." *Id*.

That injury still stands today. The Attorney General assumed in his Closure Letter that his non-binding decision to drop the investigation would mitigate the insurance increase, but that has not happened. Obria PNW promptly provided the Closure Letter to its insurance agent, but it has not received a reduction in the rate for its current coverage or a renewed offer for the coverage it once maintained. *Id*. ¶¶ 8–9. In contrast, a favorable order from this Court could alleviate Obria PNW's harm. A "substantial likelihood" that an order of the Court will provide relief is enough to show redressability, *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978), and such an order need not redress "every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). The plaintiff need only show an order can at least "effectuate a partial remedy." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021). The communications from Obria PNW's insurer show that standard is met here: Obria PNW's previous insurer said it would not renew coverage without proof that the investigation found "no wrongdoing." *See* Second Sussman Decl. ¶ 6. A court order finding that investigation unconstitutional is likely to provide that.

The Attorney General does not maintain that the letter moots this case— indeed, that argument would be foreclosed by *FBI v. Fikre*, 601 U.S. 234 (2024). Proving mootness in that case is a "formidable burden," since a different rule would allow a defendant to "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off," repeating "this cycle as necessary until it achieves all of its allegedly unlawful ends." *Id*. at 241 (cleaned up). Because "[a] live case or controversy cannot be so easily disguised," proving mootness would require the Attorney General to show what he does not even assert: that "'no reasonable expectation remains'" that he will "return to [his] old ways." *Id*. (cleaned up).

Nor is there anything about the Attorney General's closure letter that would obviate Obria PNW's injury. He dropped the investigation, but he does not disavow it, and he takes pains to insist that "[n]o inference" be drawn from the fact that the inquiry is suddenly over without explanation. Closure Letter. Obria PNW's injuries thus remain ongoing. It sent the closure letter to its insurer, but it has received no reduction in its premium. Sussman Decl. ¶ 7. The threat and its effects are still in place. Only an order from this Court can mitigate the resulting harm.

**B.     The Attorney General's enforcement efforts establish standing.**

Apart from the direct harms Obria PNW has experienced from its insurance premium increase, the Obria Clinics also have standing based on what the Attorney General has directly threatened. In *Twitter, Inc. v. Paxton*, the Ninth Circuit explained that within the context of CIDs, standing based on enforcement turns on whether the plaintiff has "an actual or well-founded fear" of enforcement by the defendant. 56 F.4th 1170, 1174 (9th Cir. 2022) (quotation omitted). While *Twitter* found that the Texas CIDs there did not create standing because they were not self-enforcing, this case is different because, as discussed below, compliance with Washington's CIDs is backed by the threat of immediate sanctions.

Thus, the Obria Clinics' standing to challenge those CIDs turns on three factors: (1) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings" to enforce the CID; (2) "whether the plaintiffs have articulated a concrete plan to violate" the CID's demand; and (3) "the history of past prosecution or enforcement" of such matters. *Id.* (quotation omitted). As to the second factor, there is no question that the Obria Clinics intend to refuse any further request to comply with what the Attorney General demanded in his CIDs and deficiency letters. And for the remaining factors, both the Attorney General's threats and his enforcement history for his CIDs establish standing.

### 1.    The Attorney General has threatened enforcement.

The Attorney General threatens enforcement on the face of the CIDs. In the *only* bold text of his CIDs, he stated directly that "**[t]he Attorney General is authorized to enforce this demand**" and that failing to obey it "**shall subject you to sanctions as provided in RCW 19.86.110**." Obria PNW CIDs at 25. And he went further too. After the Obria Clinics began producing documents, the Attorney General doubled down on his demands with deficiency letters. Deficiency Notice 2, ECF No. 4-11.

Plus, even after the Obria Clinics turned over what they hoped would be their final document production, *see* Second Suppl. Answers to CIDs, ECF No. 4-13, Third Suppl. Answers to CID, ECF No. 4-14, the Attorney General made an even bigger threat. He joined an open letter against pregnancy centers led by California Attorney General Rob Bonta, *see* Open Letter, who just weeks before had filed a consumer protection action against an Obria affiliate in California. *California v. Heartbeat Int'l, Inc.*, No. 23CV044940 (Cal. Sup. Ct.). The letter suggested that similar actions were soon to follow from the other signatories, including the Attorney General. *See* Open Letter at 8. Invoking his authority to "enforce[e] . . . consumer protection laws," the Attorney General accused pregnancy centers of "misleading consumers" and pledged to "continue to take numerous actions aiming to mitigate the harmful effects of [their] misinformation." *Id.* at 1, 8. Because the Attorney General had just joined forces with another state official who had just sued an Obria affiliate, there was little way to read his actions other than as a threat of imminent litigation.

Those threats cannot be dismissed under the rationale of *Twitter*, because Washington's CIDs, unlike those of Texas, are backed by the direct threat of sanctions. The Ninth Circuit held in *Twitter* that the Texas CIDs there were "not self-enforcing" because "Twitter never faced any penalties for its refusal to comply with the CID" until a state court enforced them. 56 F.4th at 1176 (citing Tex. Bus. & Com.

Plaintiffs' Consolidated Brief re:
Motion to Dismiss and Motion for
Summary Judgment and Final
Injunction

15

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

Code § 17.62(b), (c)). Rather, the prospect of penalties under Texas law would come only if a court entered an enforcement order and then the CID recipient flouted it. Tex. Bus. & Com. Code § 17.62(c). Because of that requirement, the Ninth Circuit said any harm from complying with the Texas CIDs was "self-inflicted" since compliance was "voluntary." *Twitter*, 56 F.4th at 1176.

Not so for Washington's consumer-protection laws, which are much more aggressive. Washington's CIDs do not just sanction disobedience of an enforcement order, they punish *disobedience of the CIDs themselves*. If a "person fails to comply with any civil investigative demand" and the Attorney General moves to compel compliance, the law provides for "such sanctions as are provided for in the civil rules for superior court with respect to discovery motions." RCW 19.86.110(9). Those civil rules impose sanctions that are presumptively mandatory. The enforcing court "*shall*"—not *may*—award "the moving party the reasonable expenses incurred in obtaining the order, including attorney fees," unless the CID recipient shows its opposition was substantially justified or some other equitable circumstance. Wash. Civ. P. R. 37(a)(4) (emphasis added). And that grant of fees is no paper tiger: the Attorney General has requested and received such fees from CID recipients from Washington state courts, which have imposed them where the CID recipient "did not produce documents or answer interrogatories in response to a CID [the court] determined to be valid." *Washington v. Brelvis Consulting LLC*, 436 P.3d 818, 833 (Wash Ct. App. 2018), *amended on reconsideration* (Mar. 12, 2019). In fact, the Attorney General conceded this point at argument on his prior motion to dismiss, admitting that "yes, maybe there was a risk of sanctions" because "the rules allow for it." Hearing Tr. at 49. So it can hardly be said that compliance is "voluntary" when one produces documents in response to a CID backed by such exorbitant sanctions threats. MTD at 8.

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

16

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

Under Article III caselaw, Washington's presumption of sanctions with enforcement matters. The Supreme Court held in *Susan B. Anthony List v. Driehaus*, that the "combination" of threatened administrative action to be followed by judicial proceedings with penalties "suffices to create an Article III injury." 573 U.S. 149, 166 (2014). And as the Ninth Circuit observed in *Twitter*, it had previously recognized standing in *White v. Lee*, 227 F.3d 1214, 1222 (9th Cir. 2000), because, at the time of a potential enforcement action, the plaintiff "could have faced a large fine." *Twitter*, 56 F.4th at 1177. In *White*, Washington state had "directed the plaintiffs under threat of subpoena" to turn over extensive information. 227 F.3d at 1229. That Washington "ultimately decided not to pursue either criminal or civil sanctions" did not prevent the court from looking "through forms to the substance of government conduct." *Id.* at 1228 (cleaned up). "Informal measures, such as the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation, can violate the First Amendment also." *Id.* (cleaned up). Coercion was present in *White* with informal actions, *id.* at 1228, so it is much more present here given the "extraordinarily intrusive and chilling measures" of the Attorney General's CID. *Id.* at 1237–38.

The Attorney General claims support from the Ninth Circuit's recent decision recognizing standing to sue him in *SPU*, 104 F.4th 50. MTD at 8. That citation is strange—the decision in *SPU* only reinforces standing. The Ninth Circuit held there that an *informal letter* supported standing because it represented "a clear sign of a substantial threat." 104 F.4th at 60. There was no CID at issue in *SPU*—only a letter that "carrie[d] no stick" because "SPU would not face sanctions for ignoring it." *Id.* at 57. Yet no matter its informality, the Ninth Circuit held that the "letter caused SPU to have a real and reasonable apprehension that it will be subject to liability." *Id.* at 60. That was because the letter identified certain practices that it suggested may violate Washington law and stated that the Attorney General was opening an inquiry on them, requesting retention of records. *Id.*

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

17

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

What was true of the informal letter in *SPU* is even more true for the formal actions here. The Attorney General's formal CIDs and subsequent deficiency letters, with their threat of sanctions, were "hardly without consequence" and "clearly raise[d] the specter of potential . . . judicial proceedings." *Id.* at 61. Given the Attorney General's threat of sanctions against the Obria Clinics, the Washington CIDs wield a "stick" to punish non-compliance. *See id.* at 57. Standing is plain.

### 2. Past enforcement of CIDs supports standing.

Enforcement history also supports standing because the Attorney General conducts robust enforcement of CIDs under the CPA. He files enforcement actions, prosecutes them on appeal, and seeks attorneys' fees for his trouble. *See, e.g.*, *Brelvis*, 436 P.3d at 833; *Matter of Confidential Consumer Prot. Investigation*, 512 P.3d 904, 915 (Wash. App. Div. 3, 2021). And this is not the first case in which the Attorney General has tried to enforce the CPA against protected speech—he went against Value Village all the way to the Washington Supreme Court, where he lost and then had to pay $5.7 million in fees for his "dismissive stance" against the First Amendment. *Washington v. TVI, Inc.,* 524 P.3d 622, 634 (Wash. 2023) (en banc); *State v. TVI, Inc.*, No. 17-2-32886-3 SEA, slip op. at 18–19 (Wash. Super. Aug. 9, 2023). And he has not "disavowed enforcement" of the CIDs here either. *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022). Instead, he has sought to drop them without consequence, demanding that"[n]o inference" be made from his decision to do so. Closure Letter. The law does not let him litigate to the edge of a decision and then withdraw his position at the precipice to escape a binding adjudication. *Fikre*, 601 U.S. at 241. The threat of enforcement still looms, and the Obria Clinics have standing to challenge it.

### C. The Attorney General inflicted multiple constitutional harms.

The Obria Clinics also have standing based on multiple sources of constitutional harm—particularly in the First Amendment context, which is not

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

18

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

"rigid" and presents "unique standing considerations." *Tingley*, 47 F.4th at 1066–67 (cleaned up). For First Amendment claims, "the Supreme Court has endorsed . . . a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "Were it otherwise, 'free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser.'" *Id.* (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). So if threatened government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000).

"[A] chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). Thus, as the Ninth Circuit explained in *Twitter*, a showing of constitutional harm under a retaliation framework "is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." 56 F.4th at 1174 (quotation omitted). And even when a plaintiff challenges a CID that, unlike here, is not backed by the immediate threat of sanctions, all that standing requires is an "objectively reasonable chilling of its speech or another legally cognizable harm from the CID." *Twitter*, 56 F.4th at 1178 n.3. Here, the Obria Clinics proffer three such harms: (1) harm to their associational rights; (2) harm to their speech rights; and (3) harm to their Fourth Amendment rights.

### 1.   Harm to the Obria Clinics' associational freedom.

The Attorney General has harmed the Obria Clinics' associational rights by demanding, on threat of sanctions, that they disclose the identity of everyone associated with them—both their leadership and their "members, employees, . . . and volunteers" too. *See* Obria PNW CIDs at 11. When the Obria Clinics did not turn over

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

19

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

that information, the Attorney General renewed his demands for it in his deficiency letters that highlighted sanctions for non-compliance. *See* Deficiency Notice at 3. This attempt at "compelled disclosure" of sensitive internal information about a nonprofit's relationships with members and volunteers is a per se harm to its protected associations. *Ams. for Prosperity*, 594 U.S. at 607; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 462 (1958); *Perry*, 591 F.3d at 1152.

It is also easy to see the likely consequences of these demands on protected association relationships based on how Attorney General's CIDs have already chilled the Obria Clinics' protected associations. One of Obria PNW's mission-aligned vendors, a faith-based provider of search-engine marketing and optimization, was advised by his attorneys "that he needed to allow the dust to settle on Obria PNW before continuing to provide services to them." First Sussman Decl. ¶ 4 (quotations omitted). That led to the vendor pausing all work for Obria PNW for several months, depriving it of the use of those services and dampening its pro-life speech. *Id*. This evidence that the vendor's "knowledge that their comments would be subject to scrutiny by the government" led them to diminish their associational activities with the Obria Clinics "suggest[s] an impact on . . . members' associational rights." *Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1460 (9th Cir. 1991) (cleaned up). So "[i]t goes without saying" that those individuals "no longer [felt] free to express their views on controversial issues," which "is precisely the sort of 'chilling'" of expression and association that the First Amendment shields. This chill on association relationships that the Attorney General's investigation has caused can be expected to continue unless an order of the Court stops it.

### 2.   Harm to the Obria Clinics' freedom of expression.

The Obria Clinics have also been harmed by the CIDs through the "objectively reasonable chilling of [their] speech." *Twitter*, 56 F.4th at 1178 n.3. For small non-profits like these, choosing to stop speaking is a reasonable response to receiving a

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

20

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

broad demand for vast troves of largely confidential information. That is especially so where the Attorney General has threatened both an enforcement action and sanctions under state law, Obria PNW CIDs at 25, which presumptively include attorneys' fees and other expenses. RCW 19.86.110(9); Wash. Civ. P. R. 37(a)(4). The likely consequence is easy to see—"fearing the arrival of subpoenas" may lead speakers to "think[] twice" before opening their mouths, which "[o]ne might suspect . . . is the whole point" of serving such demands. *Smith & Wesson*, 27 F.4th at 896–97 (Matey, J., concurring). Here too, the Attorney General's message was clear: comply with an unreasonable document demand or suffer the consequences.

The record shows the CID "actually chilled" the Obria Clinics' speech. *Cf. Twitter*, 56 F.4th at 1175; Suppl. Compl. ¶¶ 119–23. While Obria PNW has never received a request or referred a patient for abortion pill reversal, it "has previously spoken about APR and would like to more prominently publicize [its] availability to assist pregnant women who wish to stop a chemical abortion and continue their pregnancies." Suppl. Compl. ¶¶ 118–19. Yet as a direct result of AG Ferguson's investigation, Obria PNW "has not made any further public statements about APR due to fear of reprisal" from the Attorney General. *Id.* ¶ 120. Were it not for that investigation, the Obria Clinics would have "prepare[d] a brochure of materials on the safety and efficacy of APR to be distributed on social media, at its clinics, and elsewhere." *Id.* But it has forgone that project because of the Attorney General's investigation. Finally, "in an effort to limit [its] potential exposure to reprisal from [the Attorney General] for advertising [its] services, including APR, Obria PNW has discontinued operating its own website" and "instead relies upon the Obria Group to host a website listing its services." *Id.* ¶¶ 121–22. The *NIFLA* court held last week that chilling of speech about APR gave rise to standing even when the government had not acted against the plaintiff pregnancy centers. *See* 2024 WL 3904870, at *5–

6. So the same is even more true here where the Attorney General has served CIDs and put the Obria Clinics in his crosshairs.

In response, the Attorney General attempts to move the goalposts by saying that "Obria PNW has not discontinued its online presence." MTD at 9. But that's not the question. This argument fails to address what matters for chilled speech: not whether the speaker has ceased speaking altogether, but the fact that Obria PNW has stopped making certain speech and declined to speak more because of the Attorney General's investigation. The Attorney General tries to minimize this harm by arguing that Obria PNW is still making other statements about APR via the national Obria website. *See id*. But this only reinforces the chilled speech because the statements Obria PNW is making now via the national website are not the same statements that it made before (and now abandoned) on its own website. Suppl. Compl. ¶¶ 118–22. In fact, to avoid further targeting by the Attorney General, Obria PNW no longer maintains its own website and instead relies solely on content from the national Obria website to establish its internet presence. *Id*. ¶ 121. Ultimately, nothing the Attorney General says rebuts Obria PNW's sworn averments that it stopped making its own speech about APR and abandoned plans for a marketing campaign based on APR. *Id*. ¶¶ 118–22.

### 3.   Harm to the Obria Clinics' Fourth Amendment rights.

Finally, the Obria Clinics have also experienced harm to their Fourth Amendment right to privacy in their papers and effects—that is, the right to be free from unreasonable searches. *Major League Baseball*, 331 F.3d at 1180–81; U.S. Const. amend. iv. Although the Obria Clinics do not seek damages for their work in preparing the documents it has produced to date, they seek an injunction that would spare them from any further document production. They have "possessory rights over the property searched"—here, the private, sensitive documents that the Attorney General demanded in his deficiency letters and that the Clinics have not yet

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

22

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

produced. *Lyall v. City of L.A.*, 807 F.3d 1178, 1186 (9th Cir. 2015). The threat of further harm to those rights also furnishes standing. *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012).

## II.   The undisputed facts entitle the Obria Clinics to summary judgment.

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying evidence in the record that shows no genuine issue of material fact exists. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Where, as here, the pleading is a verified complaint, the pleading is part of the summary judgment record. *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987). If the movant makes its required showing, the burden then shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, '*specific facts* showing that there is a genuine issue for trial.'" *Id.* (quoting Fed. R. Civ. P. 56(e)). "Ultimately, summary judgment is appropriate against a party who 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Withey v. Fed. Bureau of Investigation*, 477 F. Supp. 3d 1167, 1171 (W.D. Wash. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

This last standard is what entitles the Obria Clinics to summary judgment. For each of the claims here—association, retaliation, and Fourth Amendment—the law imposes a burden on the Attorney General to make a specific showing. And for each of those claims, he has not even tried to make the showing the law demands. Thus, there is no issue of material fact and the Obria Clinics are entitled to summary judgment. And that necessarily means, of course, that they have pled "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) (cleaned up). The Court should

Plaintiffs' Consolidated Brief re:
Motion to Dismiss and Motion for
Summary Judgment and Final
Injunction

23

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

therefore both grant summary judgment and deny the Attorney General's motion to dismiss.

### A.     The Attorney General does not try to meet exacting scrutiny.

The Attorney General's actions have infringed on the Obria Clinics' "freedom to associate with others for the common advancement of political beliefs and ideas," which "lies at the heart of the First Amendment." *Perry*, 591 F.3d at 1152. A "plaintiff can establish" a violation of its expressive-association rights by showing that the government's enforcement actions "'will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights.'" Mot. for Prelim. Inj. at 21 (quoting *Brock v. Loc. 375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 (9th Cir. 1988)). Now that the Obria Clinics have made that showing of harm to their associational rights, *see supra* § I.B.1, the burden shifts back to the government to justify its demand. *Brock*, 860 F.2d at 350; *Americans for Prosperity*, 594 U.S. at 607; *Perry*, 591 F.3d at 1161. The Attorney General's failure to meet that burden requires summary judgment in the Clinics' favor on both their association and First Amendment privilege claims.

To justify his demands for this protected associational information, the Attorney General must show—at least—that he meets "exacting scrutiny." *Americans for Prosperity*, 594 U.S. at 607 (plurality op.). Exacting scrutiny demands "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (cleaned up). "To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (cleaned up). Plus, the standard demands that any such compelled disclosure be "narrowly tailored to the government's asserted interest." *Americans for Prosperity*, 594 U.S. at

PLAINTIFFS' CONSOLIDATED BRIEF re:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

24

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

608 (plurality op.). Such a high bar "is appropriate given the deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct in requiring disclosure." *Id.* at 607. Yet the Attorney General has not tried to meet exacting scrutiny.

Nor can he. A demand that a nonprofit disclose the identities of its members is the quintessential example of an unlawful intrusion into protected association that the Supreme Court long ago rejected in *NAACP* as violating "the free enjoyment of the right to associate." 357 U.S. at 466. And while the Attorney General relies on *Perry* for the standard for association claims, MTD at 22, he omits that the Ninth Circuit in that case rejected a demand like his using a First Amendment privilege framework. The court granted mandamus against a "clearly erroneous" district court order that had compelled a similar disclosure of the identities of leadership and high-level members of an initiative campaign. *Perry*, 591 F.3d at 1159. Because of the constitutional protection of association rights, this information could be obtained only if it was "highly relevant to the claims or defenses in the litigation." *Id.* at 1161. And while the district court had protected the identities of "rank-and-file members and volunteers," it had allowed discovery of the identities of leadership on a showing of mere relevance. *Id.* at 1164. That analysis failed to "give sufficient weight to the First Amendment interests at stake" and if accepted, would have "a chilling effect on political association and the formulation of political expression" without a showing of "sufficient need for the information." *Id.* at 1164–65. The Ninth Circuit thus granted mandamus to prohibit the disclosure. *Id.* at 1165.

The Attorney General's demand for the protected association information of the Obria Clinics is even more serious. He does not just seek leadership identities—certain of which the Obria Clinics have disclosed—he also demands the identities of rank-and-file members and volunteers, which not even the district court in *Perry* thought were relevant. Obria PNW CIDs at 11. That demand presents the greatest

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

25

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

risk to Obria PNW, where its personnel within Washington state may be subject to repercussions if their identities are disclosed to the Attorney General. And he goes even further by demanding that the Obria Clinics turn over the notices, agendas, and minutes for every board meeting and every other medical, executive, and operations meeting within the last ten years. Obria PNW CIDs at 19; *cf. Perry*, 591 F.3d at 1152 (quashing similar demand for disclosure of "internal campaign communications"). While the state officials in *Perry* and *NAACP* at least tried to justify their demands for such information—in *Perry*, with the purported need to investigate bias, and in *NAACP*, the desire to enforce a corporate registration statute—the Attorney General has proffered no purpose for which he claims these exorbitant demands are "highly relevant." *Perry*, 591 F.3d at 1161; *accord NAACP*, 357 U.S. at 464–65. Much less has he shown any reason that his requests are "narrowly tailored" to achieve it. *Americans for Prosperity*, 594 U.S. at 608 (plurality op.). Because he cites no evidence on this essential element as to which he bears the burden, the Obria Clinics are entitled to summary judgment. *Withey*, 477 F. Supp. 3d at 1171.

Rather than addressing the key showing the law demands, the Attorney General attempts to distract. He tries to dismiss the Obria Clinics as raising a mere business association claim, not an expressive association claim. MTD at 20–22. But that allegation is betrayed by the pleadings and the evidence. The Obria Clinics' verified complaint twice specifically alleged that his demand for identities of leadership, "members, employees, contractors, and volunteers" was unlawful, including in alleging their association claim. Suppl. Compl. ¶¶ 105(d), 147. The Obria Clinics pled the close expressive relationship of Christian belief that exists within and between these individuals associated with them. *Id.* ¶¶ 48-61, 142-44. And they alleged in their First Amendment privilege claim that "[c]ompelled disclosure of associations adversely affects protected speech and association by inducing members

PLAINTIFFS' CONSOLIDATED BRIEF re:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

26

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

to withdraw from the association and dissuading others from joining it for fear of exposure of their beliefs." *Id.* ¶ 160.

The Attorney General, in contrast, focuses only on the damage to Plaintiffs' relationship with other faith-based, mission-aligned vendors, trying to characterize the claim as business-only. But those harms alleged by Obria PNW are not the only harms—rather, they build on the more fundamental associational harms from the Attorney General's demand for compelled disclosure. Plus, since the Attorney General's investigation damaged relationships with vendors who are mission-aligned with the Obria Clinics, these allegations concern harm to expressive association, not just business relationships. *See* First Sussman Decl. ¶ 2–5. The Clinics' sworn averments of the harm to its expressive association rights are all undisputed, and the Attorney General's attempt to write them off is untenable.

## B. The Attorney General has not met his burden as to retaliation.

A retaliation claim requires a plaintiff to show three elements: (1) it "was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*, 818 F.3d at 932 (quotation omitted). "Once a plaintiff has made [that] showing, the burden shifts to the government to show that it 'would have taken the same action even in the absence of the protected conduct.'" *Id.* (quotation omitted); *accord Boquist*, 32 F.4th at 777. The Obria Clinics have made the showing required to shift that burden to the Attorney General, but he has failed to meet it in response. Summary judgment is required.

### 1. The Obria Clinics have proven the elements of retaliation.

All three elements of retaliation are established, either because the Attorney General does not challenge them or because his own written statements prove them.

*First*, the Attorney General does not dispute that the Obria Clinics' speech about APR is protected. Indeed, it was because of this same protected speech "about how a woman might save her pregnancy" that the *NIFLA* court last week enjoined the New York Attorney General from prosecuting pregnancy centers. 2024 WL 3904870, at \*12. "The First Amendment protects Plaintiffs' right to speak freely about APR protocol and, more specifically, to say that it is safe and effective for a pregnant woman to use in consultation with her doctor." *Id.* at \*10. The same is true here.

*Second*, though the Attorney General denies it now, his own writings establish causation. His consumer alert emphasizes his fundamental problem with pregnancy centers. He says Washingtonians should "[b]eware of clinics that claim to offer reproductive health care but refuse to perform abortions or give abortion referrals"— that is, they should beware of any clinic with pro-life views. Consumer Alert at 2. Plus, his CIDs here specifically draw the causal connection to protected speech by stating on their face that he is investigating "representations relating to Abortion Pill Reversal." Obria PNW CIDs at 1. And his open letter reinforces both points: his first-page objection to pregnancy centers is that they "do not provide abortions or abortion services," Open Letter at 1, and he dismisses their views about APR as "misinformation." *Id.* at 4 (claiming "[t]here is no credible science or evidence" to support pregnancy centers' claims that progesterone "can 'reverse' the effects" of mifepristone).

*Third*, the same open letter also shows that his actions would chill a person of ordinary firmness. It specifically cites California's efforts to sue other pregnancy centers under consumer protection law for making statements that APR works. *Id.* at 3 n.16. And it pledges to "continue to take numerous actions aiming to mitigate the harmful effects of [pregnancy center] misinformation." *Id.* at 8. Such efforts are specifically calculated to stop the same speech about APR that the Attorney General's investigation chilled here. It is hard to see how the Attorney General's service of a

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

28

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1    consumer protection CID about APR would not reasonably have such a chilling effect.

2    Nor would the purportedly "robust procedural protections" of Washington state court

3    stop that chill, MTD at 17, especially when those "robust procedural protections"

4    come with presumptively mandatory sanctions for non-compliance. *See supra* § I.B.1.

5                    **2.      The Attorney General has not met his burden.**

6            The Obria Clinics' undisputed showing shifts the burden of proof to the

7    Attorney General, but he has not attempted to meet it. Instead, he tries to flip the

8    onus to the Obria Clinics. He says they have not shown "a similarly-situated

9    comparator was treated differently," MTD at 19, and that he need not "provide

10   investigation targets with an evidentiary basis." *Id.* at 20. But whatever the truth of

11   that claim as a matter of state law, it is false as a matter of the constitution: where,

12   as here, the investigation target has pled evidence of retaliation, the "burden-shifting

13   framework" demands that the Attorney General show he "would have taken the same

14   action even in the absence of the . . . protected conduct." *Vullo*, 602 U.S. at 204

15   (Jackson, J., concurring). His refusal to do so dooms his defense and demands

16   summary judgment.

17          Just as with his attempt to refute standing, the cases that the Attorney

18   General highlights only bolster the Obria Clinics' retaliation claim. He tries to

19   distinguish *Frederick Douglass* because it involved "two different groups [who]

20   protested publicly, saying "in one instance that 'Black Lives Matter,' and in the other

21   that 'Black Pre-Born Lives Matter.'" MTD at 20 (citing 82 F.4th at 1138). But the

22   same side-by-side comparison applies here: Planned Parenthood and the Obria

23   Clinics both provide many of the same services to women, but Planned Parenthood

24   says abortion is healthcare while the Obria Clinics say it takes the life of an unborn

25   baby. Just like in *Frederick Douglas*, the Attorney General takes sides in that dispute:

26   he has publicly allied himself with Planned Parenthood, Suppl. Compl. ¶ 86, while he

27   warns consumers to "beware" of pregnancy centers like Obria that "refuse to perform

28

Plaintiffs' Consolidated Brief re:
Motion to Dismiss and Motion for
Summary Judgment and Final
Injunction

29

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

abortions." Consumer Alert at 2. And he didn't stop there—he took state action based on his views by commencing a consumer protection investigation against the Obria Clinics for saying that APR was effective and for unspecified "unfair acts or practices related to the collection and use of consumer data." Obria PNW CIDs at 1.

If anything, as in *Frederick Douglass*, any meaningful difference in the "legitimate prosecutorial factors" between Planned Parenthood and Obria cuts against the Attorney General. 82 F.4th at 1137. Planned Parenthood charges for its services and has a well-publicized history of patient data breaches. Suppl. Compl. ¶ 117. Yet the Attorney General decided to investigate a pro-life pregnancy center that provides only free services and that has no such history (nor any allegation otherwise). *Id.* ¶ 5. Plus, the Attorney General has left alone Planned Parenthood's commercial activity in charging for abortions, which is undisputedly subject to the CPA. Instead, he chose to investigate the speech of religious nonprofits "about how a woman might save her pregnancy" that could scarcely be "less commercial." *NIFLA*, 2024 WL 3904870, at *12. Under *Frederick Douglass*, this "lopsided prosecutorial response" is devastating to the Attorney General. 82 F.4th at 1138.

Similarly, the Attorney General unpersuasively claims that the Supreme Court's unanimous decision in *Vullo* helps him. He cites *Vullo* for the proposition that "Attorneys General are elected officials and are not required 'to maintain viewpoint-neutrality.'" MTD at 18 (quoting *Vullo*, 602 U.S. at 187)). But he ignores the crucial sentences that follow: that a government official may "share her views freely and criticize particular beliefs," yet cannot "use the power of the State to punish or suppress disfavored expression." 602 U.S. at 188. And just as in *Vullo*, that means a government official who has expressed his views publicly and then acted against a speaker with opposing views cannot justify the action by claiming that their views are just "permissible government speech." *Id.* at 194. Rather, the official's speech must be evaluated "against the backdrop of other allegations," including official

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

30

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1  actions taken against those with opposing views. *Id.* at 195. In *Vullo*, the

2  government's hostility to the NRA's expression, coupled with coercive state action,

3  would have established a retaliation claim. *Id.* at 203–204 (Jackson, J., concurring).

4  The same is true of the Obria Clinics' showing here.

5  **C.    The Attorney General fails his Fourth Amendment burden.**

6  In every context, the Fourth Amendment demands an evidentiary basis for a

7  search. Justice Holmes explained a century ago that "[a]nyone who respects the spirit

8  as well as the letter of the Fourth Amendment" understands that it does not permit

9  the government to "direct fishing expeditions into private papers on the possibility

10  that they may disclose evidence of crime." *Federal Trade Comm. v. American Tobacco*

11  *Co.*, 264 U.S. 298, 305–06 (1924). "It is contrary to the first principles of justice to

12  allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the

13  hope that something will turn up." *Id.* at 306.

14  Thus, the validity of a government investigation under the Fourth Amendment

15  depends on whether it is supported by an adequate basis in the law and is within "the

16  agency's jurisdiction." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep.*

17  *Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). Courts have also applied that

18  standard to CIDs, describing "[t]he level of proof required of the investigative agency"

19  as "something more than a fishing expedition, and something less than probable

20  cause." *Major League Baseball*, 331 F.3d at 1187 (quotation omitted). Thus, the

21  agency must have "specific grounds for its suspicion of liability." *In re McVane*, 44

22  F.3d 1127, 1140 (2d Cir. 1995); *accord Resol. Tr. Corp. v. Walde*, 18 F.3d 943, 949

23  (D.C. Cir. 1994). Here, the Attorney General cites none.

24  The Attorney General's failure to meet his Fourth Amendment burden

25  requires summary judgment. He says he need not make that showing, MTD at 20,

26  but again, constitutional law is to the contrary. If an investigative demand is

27

28  PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

31

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

challenged under the Fourth Amendment, "a ground must be laid and the ground and the demand must be reasonable." *American Tobacco*, 264 U.S. at 306. Rather than make the required showing, the Attorney General focuses on a variety of other purported issues he has with the Obria Clinics' Fourth Amendment claim. He says that Obria has remedies in state court, MTD at 22, that he did not need a complaint to investigate, *id.* at 23, that the CPA applies here, *id.*, that there is no statute of limitations for him, *id.*, and that his CIDs are not overbroad, *id.* at 23–24. But all of those questions are irrelevant without answering one critical threshold question: *what was his evidence that the Obria Clinics may have violated the law*, such that he had a right to demand they produce their papers and effects in the first place? To this day, he has offered no answer and cited no evidence. That means the Court need not even address any of his other objections. Instead, it should simply grant summary judgment and issue an injunction.

At the very least, the Court should permanently enjoin the Attorney General from seeking any further discovery beyond what the Obria Clinics have already produced to him. For now, he has dropped his investigation, but he insists that no inference be made about him doing so, *see* Closure Letter, and his successor could resume it at will. So it matters very much that even if he had some basis to suspect a violation of the law, his investigative demands are grossly overbroad. The *stated* bases of his investigation are "possible past or current . . . unfair or deceptive . . . marketing" and "unfair acts or practices related to . . . consumer data." Obria PNW CIDs at 1. Those bases could not plausibly warrant his demand for the identities of the Obria Clinics' accountants, bookkeepers, and tax preparers, *id.* at 11; its banking information, *id.*; the identities of all volunteers, *id.*; its donor information, *id.* at 18, 20; thirteen years of complete, unredacted notices, agendas, and minutes of all board meetings, *id.* at 19; all its tax forms, schedules, and attachments, *id.* at 20; employee pension and retirement account contributions, *id.* at 21; and more. The phrase

1   "without limitation" appears 40 times in the CID to Obria Group and 29 times in the

2   CID to Obria PNW. *See* Obria PNW CIDs; Obria Group CIDs, ECF No. 4-2. This

3   fishing expedition casts a very wide net indeed. And it violates the Fourth

4   Amendment.

5 **III.   The Obria Clinics are entitled to a permanent injunction.**

6       Permanent injunctive relief is appropriate if the plaintiff shows four elements:

7       (1) that it has suffered an irreparable injury; (2) that remedies

8       available at law, such as monetary damages, are inadequate to
      compensate for that injury; (3) that, considering the balance of the

9       hardships between the plaintiff and defendant, a remedy in equity is
      warranted; and (4) that the public interest would not be disserved by a

10      permanent injunction.

11 *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir.

12 2014) (quotation omitted). A court's decision to grant a permanent injunction rests

13 within its "equitable discretion," and a court should consider "the totality of

14 circumstances" in making its determination whether to grant relief. *Id.* at 880.

15 (internal quotation marks omitted). A permanent injunction is warranted here.

16      *First*, the Obria Clinics have suffered irreparable harm from the Attorney

17 General's unlawful CIDs. They "are irreparably harmed each day that their First

18 Amendment freedoms are infringed." *NIFLA*, 2024 WL 3904870, at *10; *Elrod v.*

19 *Burns*, 427 U.S. 347, 373 (1976) (plurality op.). And here, the Obria Clinics not only

20 face irreparable harm to their speech and association rights under the First

21 Amendment, but they also face practical harms including increased insurance

22 premiums and damage to relationships with mission-aligned vendors.

23      *Second*, for the same reasons, the Obria Clinics have no adequate remedy at

24 law to redress their injury. Damages cannot unchill speech that remains unspoken,

25 compensate for the wrongful disclosure of a protected identity, reimburse for an

26

27

28 Plaintiffs' Consolidated Brief re:
Motion to Dismiss and Motion for
Summary Judgment and Final
Injunction

33

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

ongoing risk effect on insurance premiums, or repair relationships frayed by the threat of his investigation. Relief for these harms is solely within the realm of equity.

*Third*, unlike the irreparable harm the Obria Clinics face, the Attorney General faces no harm from being confined to his lawful powers. "The fact that Plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). Nor does he face any harm—much less irreparable harm—in losing out on documents for an investigation that he has now stated his intent to withdraw.

*Fourth*, a final injunction is in the public interest. The Ninth Circuit has "consistently recognized the significant public interest in upholding First Amendment principles." *Id.* (cleaned up). "Indeed, it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (internal quotation omitted). Here, where the Attorney General has for so long opposed the Obria Clinics' First Amendment freedoms—and for so long resisted attempts for federal courts to decide them—it is critical that the Court compel him to act within the bounds of the law.

Finally, as for the scope of relief, the Obria Clinics submit that the Court should enter the final injunction they have proffered as a proposed order. That injunction would require that, if the Attorney General seeks to resume any investigation or prosecution of the Obria Clinics over the matters in his CIDs, he must make the constitutional showings that are required by the association, retaliation, and Fourth Amendment claims in this case. Such relief will not restrain the Attorney General from any lawful investigation of the Obria Clinics or any other party, but it will ensure that if he elects to pick up again the actions he strategically abandoned, he will have to make the mandatory constitutional showings that he has so far ignored. That injunction will adequately protect the Obria Clinics'

constitutional rights, remove the chilling effect on their speech and association, and likely lead to the reduction of the Obria Clinics' insurance premiums. The Court should grant it.

## CONCLUSION

The Court should deny the Attorney General's motion to dismiss and grant summary judgment, issuing a permanent injunction in favor of the Obria Clinics.

* * * *

I certify that this memorandum contains 11,589 words, in compliance with the Court's June 7, 2024 Order.

Respectfully submitted this 26th day of August, 2024.

*/s/ Lincoln Davis Wilson*

Kristen K. Waggoner, Wa. Bar No. 27790
Lincoln Davis Wilson, Wa. Bar No. 53764
Timothy A. Garrison (admitted pro hac vice)
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
kwaggoner@ADFLegal.org
lwilson@ADFLegal.org
tgarrison@ADFLegal.org

Nathaniel L. Taylor, Wa. Bar No. 27174
Abigail St. Hilaire, Wa. Bar No. 48194
ELLIS, LI & MCKINSTRY PLLC
1700 7th Ave Suite 1810
Seattle, WA 98101
Telephone: 206-682-0565
ntaylor@elmlaw.com
asthilaire@elmlaw.com

*Counsel for Plaintiffs*

PLAINTIFFS' CONSOLIDATED BRIEF RE:
MOTION TO DISMISS AND MOTION FOR
SUMMARY JUDGMENT AND FINAL
INJUNCTION

35

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1

**CERTIFICATE OF SERVICE**

2  I certify that on August 26, 2024, I caused a true and correct copy of the

3 foregoing document to be served via ECF upon all counsel of record.

4

5 DATED: August 26, 2024.     _/s/ Lincoln Davis Wilson_

                   Lincoln Davis Wilson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CONSOLIDATED BRIEF RE:     ALLIANCE DEFENDING FREEDOM
MOTION TO DISMISS AND MOTION FOR   440 First Street NW, Suite 600
SUMMARY JUDGMENT AND FINAL     Washington, DC 20001
INJUNCTION       36     (202) 393-8690