1
2
3
4
5
6
7
8
9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**TACOMA DIVISION**

| | |
|---|---|
| **OBRIA GROUP, INC., and MY CHOICES d/b/a OBRIA MEDICAL CLINICS PNW,** | Civil No.: 3:23-cv-06093-TMC |
| *Plaintiffs,* | **PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS** |
| v. | NOTE ON MOTION CALENDAR: |
| **ROBERT FERGUSON**, in his official capacity as Attorney General for the State of Washington, | **October 25, 2024** |
| *Defendant.* | ORAL ARGUMENT REQUESTED |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Table of Authorities ..................................................................................... ii

Introduction ................................................................................................. 1

Background .................................................................................................. 3

    A.    The Obria Clinics serve Washington women and men. ......................... 3

    B.    The Attorney General publicly opposes pregnancy centers. ................. 4

    C.    The Attorney General serves CIDs and deficiency letters. ................... 6

    D.    The Obria Clinics sue and the Attorney General denies harm. ............. 6

    E.    The CIDs cause an increase in Obria PNW's insurance premium ......... 7

    F.    The Attorney General drops his investigation. ...................................... 7

Argument ..................................................................................................... 7

I.    The Obria Clinics' standing is beyond reasonable dispute. ............................ 7

    A.    Obria PNW's insurance premium increase establishes standing. ......... 8

    B.    The Attorney General's enforcement efforts establish standing. ......... 11

    C.    The Attorney General inflicted multiple constitutional harms. ........... 15

        1.    Harm to the Obria Clinics' associational freedom. ................... 15

        2.    Harm to the Obria Clinics' freedom of expression. ................... 16

        3.    Harm to the Obria Clinics' Fourth Amendment rights. ............. 18

II.    The Obria Clinics have pled cognizable claims. ........................................... 19

    A.    The Obria Clinics have pled cognizable association claims. ................ 19

    B.    The Obria Clinics have pled plausible retaliation claims. .................... 21

    C.    The Obria Clinics have pled valid Fourth Amendment claims. ........... 25

Conclusion ................................................................................................. 26

PLAINTIFF'S BRIEF IN OPPOSITION TO
MOTION TO DISMISS

i

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.,*
    No. 2:16-CV-00750-CB, 2018 WL 1660743 (W.D. Pa. Mar. 21, 2018)................. 10

*Americans for Prosperity Foundation v. Bonta,*
    594 U.S. 595 (2021) ..................................................................... passim

*Arizona Right to Life Political Action Committee v. Bayless,*
    320 F.3d 1002 (9th Cir. 2003) ................................................................ 16

*Block v. Meese,*
    793 F.2d 1303 (D.C. Cir. 1986)................................................................ 10

*Boquist v. Courtney,*
    32 F.4th 764 (9th Cir. 2022) .......................................................... 2, 22

*Brock v. Local 375, Plumbers International Union of America, AFL-CIO,*
    860 F.2d 346 (9th Cir. 1988) ................................................................ 19

*Cedar Park Assembly of God of Kirkland, Washington v. Kreidler,*
    860 F. App'x 542 (9th Cir. 2021) ........................................................ 2, 8

*Consumer Finance Protection Bureau v. Accrediting Council for Independent*
    *Collseges & Schools,*
    854 F.3d 683 (D.C. Cir. 2017) ................................................................ 25

*Department of Commerce v. New York,*
    588 U.S. 752 (2019) .................................................................. 1, 9, 10

*Dole v. Service Employees Union, AFL-CIO, Local 280,*
    950 F.2d 1456 (9th Cir. 1991 ................................................................ 16

*Dreiling v. American Express Co.,*
    458 F.3d 942 (9th Cir. 2006) ................................................................ 19

*Duke Power Co. v. Carolina Environmental Study Group., Inc.,*
    438 U.S. 59 (1978) ............................................................................ 10

*FBI v. Fikre,*
    601 U.S. 234 (2024) ...................................................................... 11, 15

*Federal Trade Commision v. American Tobacco Co.,*
    264 U.S. 298 (1924) .......................................................................... 25

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS                         ii

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*Frederick Douglass Foundation, Inc. v. District of Columbia*,
  82 F.4th 1122, (D.C. Cir. 2023) ............................................... 2, 3, 23, 24

*In re Express Scripts, Inc., Pharmacy Benefits Management Litigation*,
  No. MDL 1672, 2007 WL 1796224 (E.D. Mo. June 20, 2007) ............................ 10

*In re McVane*,
  44 F.3d 1127 (2d Cir. 1995) ........................................................ 25

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010) ................................................................ 19

*Larson v. Valente*,
  456 U.S. 228 (1982) ................................................................ 10

*Libertarian Party of L.A. Cnty. v. Bowen*,
  709 F.3d 867 (9th Cir. 2013) ....................................................... 16

*LSO, Ltd. v. Stroh*,
  205 F.3d 1146 (9th Cir. 2000) ...................................................... 16

*Lyall v. City of Los Angeles*,
  807 F.3d 1178 (9th Cir. 2015) ...................................................... 18

*Major League Baseball v. Crist*,
  331 F.3d 1177 (11th Cir. 2003) ............................................... 2, 18, 25

*Matter of Confidential Consumer Protection Investigation*,
  512 P.3d 904 (Wash. App. Div. 3, 2021) ............................................. 15

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ....................................................... 18

*NAACP v. Alabama ex rel. Patterson*,
  357 U.S. 449, (1958) ......................................................... 15, 20, 21

*National Institute for Family & Life Advocates v. James*,
  No. 1:24-cv-514, 2024 WL 3904870 (W.D.N.Y. Aug. 22, 2024) ............. 3, 18, 22, 24

*National Rifle Association v. Vullo*,
  602 U.S. 175 (2024) .......................................................... 2, 24, 25

*O'Brien v. Welty*,
  818 F.3d 920 (9th Cir. 2016) ................................................. 16, 19, 22

*Perry v. Schwarzenegger*,
  591 F.3d 1147 (9th Cir. 2010) ................................................. passim

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS                                iii

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*Resolution Trust Corporation v. Walde,*
    18 F.3d 943 (D.C. Cir. 1994) ................................................. 25

*Savage v. Glendale Union High School, Dist. No. 205, Maricopa County,*
    343 F.3d 1036 (9th Cir. 2003) ................................................. 8

*Seattle Pacific University v. Ferguson,*
    104 F.4th 50 (9th Cir. 2024) ................................................. 2, 14

*Smith & Wesson Brands, Inc. v. Attorney General of New Jersey,*
    27 F.4th 886 (3d Cir. 2022) ................................................. 17

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................. 14

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ................................................. 11, 15, 16

*Twitter, Inc. v. Paxton,*
    56 F.4th 1170 (9th Cir. 2022) ................................................. passim

*Union Gospel Mission of Yakima v. Ferguson,*
    No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024) ...................... 2

*Uzuegbunam v. Preczewski,*
    141 S. Ct. 792 (2021) ................................................. 10

*Washington v. Brelvis Consulting LLC,*
    436 P.3d 818 (Wash Ct. App. 2018), *amended on reconsideration* (Mar. 12,
    2019) ................................................. 13, 15

*Washington v. TVI, Inc.,*
    524 P.3d 622 (Wash. 2023) ................................................. 15

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) ................................................. 14

*WildEarth Guardians v. U.S. Forest Service,*
    70 F.4th 1212 (9th Cir. 2023) ................................................. 9

## Statutes

RCW 19.86.110 ................................................. 13, 17

Tex. Bus. & Com. Code Ann. § 17.62(c) (West 2023) ................................................. 13

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS
iv
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

## **Other Authorities**

*Designed to Deceive: A Study of the Crisis Pregnancy Center Industry in Nine States*, Alliance State Advocates, https://bit.ly/3N8f0db ........................................ 5

Kendall @ Planned Parenthood, *Crisis Pregnancy Centers: What to Know and How to Spot Them* (Nov. 4, 2021), https://bit.ly/3XiPEPF ..................................... 5

Washington State Attorney General's Office, *Know Your Rights: Reproductive Health Care*, https://bit.ly/3TQhell ............................................................. 4

Washington State Office of the Attorney General, *Reproductive Rights Complaint Form*, https://bit.ly/4dAs2vN ................................................ 4

## **Rules**

Wash. Civ. P. R. 37 ............................................................................. 13, 17

## **Constitutional Provisions**

U.S. Const. amend. iv ............................................................................. 18

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

v

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

**INTRODUCTION**

The Attorney General has painted himself into a corner. For months, and up through the hearing on the Obria Clinics' motion for preliminary injunction, he insisted that the Court lacked jurisdiction to decide the Clinics' constitutional claims. He continued in that posture when the Clinics detailed the increased insurance cost Obria PNW expected to face from his unconstitutional investigation. But when Obria PNW quantified the increase in its premium—a nearly five-fold jump—he changed course.

In an apparent attempt to moot the case, he issued a letter stating that his investigation was closed and that he would not institute any litigation against the Obria Clinics. Ex. A to Stipulated & Proposed Order, ECF No. 38-1 ("Closure Letter"). And he said he was issuing this closure letter—as "an exception" to his official policy—"to provide [the Obria Clinics] with a statement they can offer to their insurer, which will provide certainty as to the status of *this investigation*." *Id.* (emphasis added).

Now he appears to regret having sent the letter. He realizes too late that his voluntary cessation of wrongful conduct cannot moot the case, so he does not even argue mootness. And while he continues to insist the Clinics lack standing, his own words in his closure letter show the opposite. By admitting he was departing from his ordinary policy on closure letters so Obria PNW would have something to give its insurer concerning his investigation, he established the causal connection he now attempts to deny. His actions simply acknowledge the obvious: that this premium hike is "the predictable effect of Government action on the decisions of third parties." *Department of Com. v. New York*, 588 U.S. 752, 768 (2019).

The Attorney General's attempt to defeat standing on this and four other grounds is so weak that he resorts to recharacterizing Ninth Circuit decisions *against* him as cases in *support*. *Cedar Park Assembly of God of Kirkland, Washington v.*

PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION TO DISMISS

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

*Kreidler*, 860 F. App'x 542 (9th Cir. 2021) (unpublished); *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024) *("SPU")*; *see also Union Gospel Mission of Yakima v. Ferguson*, No. 23-2606, 2024 WL 3755954 (9th Cir. Aug. 12, 2024). He cannot avoid federal jurisdiction.

He fares no better on the merits. For the First Amendment association and privilege claims, the Clinics have pled facts that show the Attorney General's demands for disclosure of their protected associations do not meet "exacting scrutiny." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–07 (2021) (plurality op.). For retaliation, they have pled facts that show he would not have served these demands but for Obria's protected pro-life speech. *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022). And for the Fourth Amendment, they have pled facts that show he lacked any reason to think that Obria violated the Washington Consumer Protection Act—for he has not cited any. *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003).

In response, the Attorney General again tries to recast critical adverse decisions against him as supporting his position. But *Perry v. Schwarzenegger* does not favor him—it halted a similar attempt to compel disclosure of protected membership identities. 591 F.3d 1147, 1152 (9th Cir. 2010). Likewise, *Frederick Douglass Foundation, Inc. v. District of Columbia* found unlawful action against protected speech in the same sort of disparate treatment that the Attorney General engaged in here. 82 F.4th 1122, 1138 (D.C. Cir. 2023). And the Supreme Court's unanimous decision last term in *NRA v. Vullo* held that the same sort of public hostility the Attorney General has shown to pregnancy centers supports First Amendment claims. 602 U.S. 175, 194 (2024); *see also id.* at 204 (Jackson, J., concurring).

The Attorney General's conduct here is part of a pattern, coordinated with the other attorneys general who co-signed the same open letter condemning pregnancy

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

2

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

centers. Fraas Decl. Ex. A at 1, ECF No. 23-3 ("Open Letter"). Another federal court recently enjoined a related campaign of hostility by New York's Attorney General against pregnancy centers who were making the same speech the Attorney General targets here. *See National Inst. for Fam. & Life Advocs. v. James*, No. 1:24-cv-514, 2024 WL 3904870 (W.D.N.Y. Aug. 22, 2024) ("*NIFLA*"). If state officials can subject small nonprofits to threats and punishing compliance costs and then avoid federal scrutiny while he chills their speech, there is no telling which cause—or which side of the political aisle—will suffer next.

The First Amendment exists to ensure that the government does "not enforce the laws in a manner that picks winners and losers in public debates." *Frederick Douglass*, 82 F.4th at 1142. And the need for free speech is most acute "in the fields of medicine and public health, where information can save lives." *NIFLA*, 2024 WL 3904870 at *10 (quotation omitted). So "[i]t would undermine the First Amendment's protections for free speech if the government could enact a content-neutral law," like the CPA, "and then discriminate against disfavored viewpoints under the cover of prosecutorial discretion." *Frederick Douglass*, 82 F.4th at 1142. The Court should deny the Attorney General's motion to dismiss.

## BACKGROUND

### A.  The Obria Clinics serve Washington women and men.

The Obria Group is a national network of Christian pro-life pregnancy centers, and Obria PNW is a local affiliate that runs three medical clinics in Washington state. Third Suppl. Verified Compl. ¶¶ 2, 30, 44, 45, ECF No. 43 ("Suppl. Compl.") Under the direction of a Medical Director, the Clinics provide many of the same services as Planned Parenthood (but at no cost to any patient), including pregnancy testing, sexually transmitted disease and infection (STD/STI) testing, ultrasounds, well-woman examinations, and cancer screenings. *Id.* ¶¶ 62, 65. As pro-life organizations, however, the Clinics do not provide or refer for abortions. *Id.* ¶ 63(f). And while the

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

Clinics do not currently provide abortion pill reversal (APR) (prescribing supplemental progesterone to counter the effects of mifepristone), *id.* ¶ 69, they stand ready to refer APR for women who have taken mifepristone and changed their mind about completing their chemical abortion. *Id.* ¶ 68.

**B.    The Attorney General publicly opposes pregnancy centers.**

The Attorney General publicly opposes pregnancy centers like the Obria Clinics. Suppl. Compl. ¶¶ 80–100. He does so in several ways:

**Consumer Alert:** The Attorney General issued an alert warning consumers against pregnancy centers. *See* Washington State Attorney General's Office, *Know Your Rights: Reproductive Health Care*, https://bit.ly/3TQhell ("Consumer Alert"). The Attorney General's alert states that consumers should "[b]eware of clinics that claim to offer reproductive health care but refuse to perform abortions or give abortion referrals." *Id.* at 2. He says pregnancy centers may "provide incomplete, medically inaccurate information" but does not say what that information is. *Id.* And he says—falsely in Obria's case, Suppl. Compl. ¶ 71—that "[t]hese clinics are not subject to HIPAA." Consumer Alert at 2. He tells consumers to go instead to abortion clinics, referring them to lists maintained by the National Abortion Federation. Consumer Alert at 2.

**Complaint Form:** Through an online form, the Attorney General invites the public to report if they "[e]xperienced deception, harassment, or other misconduct at a . . . pregnancy center." Washington State Office of the Attorney General, *Reproductive* Rights Complaint Form, https://bit.ly/4dAs2vN. The form is one-sided: it does not offer any option to complain about deception or misconduct by abortion clinics, *see id.*, even though those clinics charge for their services. The Attorney General does not allege he has received any complaint against the Obria Clinics (or any other pregnancy care center for that matter).

Plaintiffs' Brief in Opposition to
Motion to Dismiss                    4

Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

**Open Letter:** The Attorney General joined an open letter with other state attorneys general attacking pregnancy centers as they "have proliferated in [their] states, outnumbering abortion clinics by a three-to-one ratio." *See* Open Letter at 1. The first complaint in his letter is that pregnancy centers "do not provide abortions or abortion services." *Id.* at 1. He criticizes pregnancy centers for purported misstatements about APR and for having "commonly offered maternity and baby supplies." *Id.* at 1–2, 6. The Open Letter relies principally on "Designed to Deceive," *see id.* at 2–3, 5–6, a report attacking pregnancy centers and written by pro-abortion activists at Gender Justice, Legal Voice, the Southwest Women's Law Center, and the Women's Law Project. *See Designed to Deceive: A Study of the Crisis Pregnancy Center Industry in Nine States*, Alliance State Advocates, https://bit.ly/3N8f0db. The letter cites the lawsuit filed by the California Attorney General against an affiliate of Obria, *see* Open Letter at 3 n.16, and it closes with a pledge to "continue to take numerous actions aiming to mitigate the harmful effects of [pregnancy centers'] misinformation." *Id.* at 8.

**Partnership with Planned Parenthood:** The Attorney General has partnered with Planned Parenthood, a pro-abortion network of clinics that charges for its services. Suppl. Compl. ¶¶ 83, 86. In 2019, the Attorney General said his office "worked very closely, obviously, with Planned Parenthood" in abortion litigation. *Id.* ¶ 86. Planned Parenthood calls him a "champion for abortion access" and "reproductive health." *Id.* ¶ 92. He celebrated "Abortion Provider Appreciation Day" by participating in a forum with Planned Parenthood, local abortion providers, and abortion advocates. *Id.* ¶ 94. Notably, Planned Parenthood itself independently opposes pregnancy centers, which it calls "fake clinics." *See* Kendall @ Planned Parenthood, *Crisis Pregnancy Centers: What to Know and How to Spot Them* (Nov. 4, 2021), https://bit.ly/3XiPEPF.

**C.     The Attorney General serves CIDs and deficiency letters.**

The Attorney General served civil investigative demands (CIDs) on the Obria Clinics under the Washington Consumer Protection Act (CPA). Suppl. Compl. ¶ 102. The CIDs state that the Attorney General is investigating "unfair or deceptive acts and practices . . . concerning services provided to Washington consumers, including . . . Abortion Pill Reversal," and "unfair acts or practices related to the collection and use of consumer data." *See* Ex. A to Mot. for Prelim. Inj. at 1, ECF No. 4-3 ("Obria PNW CIDs"); *accord* ECF No. 4-2 (substantially similar CIDs for Obria Group). The CIDs cite no basis for suspecting that the Obria Clinics are engaged in such activity. *See* Obria CIDs at 5. Nor has the Attorney General served Planned Parenthood with such CIDs, even though Planned Parenthood has a documented and public history of leaks and breaches of patient data. Suppl. Compl. ¶ 117.

The CIDs demand ten years' worth of information from the Obria Clinics, including the request that it identify all its affiliates, bank accounts, tax personnel, and "all directors, officers, principals, agents, members, employees, contractors, and volunteers associated with" it, Obria PNW CIDs at 10–11, and produce all board minutes and agendas and financial statements, *id.* at 19–20. The Obria Clinics conferred with the Attorney General about these requests and produced about 1,500 pages of documents. Suppl. Compl. ¶¶ 113, 116. But the Attorney General served deficiency letters deeming these responses inadequate and demanding "full and complete responses" to the CIDs. *Id.* ¶ 114; *see also* Deficiency Notices, ECF Nos. 4-11, 4-12.

**D.     The Obria Clinics sue and the Attorney General denies harm.**

The Obria Clinics sued and moved to enjoin enforcement of the CIDs. Along with their threats of sanctions, enforcement, and disclosure of documents, the CIDs caused the Obria Clinics to chill their own speech about APR and damaged their relationships with mission-aligned vendors. Suppl. Compl. ¶¶ 120–22; Declaration of

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

6

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

River Sussman, Feb. 12, 2024, ECF No. 25-1 ("First Sussman Decl.") ¶¶ 2–5. The Attorney General denied that his actions had caused any cognizable harm and moved to dismiss. The Court heard argument on the parties' motions.

### E.     The CIDs cause an increase in Obria PNW's insurance premium.

After suing, Obria PNW had to disclose the CIDs it received in connection with its application to renew certain of its insurance policies. Suppl. Compl. ¶¶ 124–125. Obria PNW then received notice from its insurance agency that, as a direct result of truthfully acknowledging the CIDs, the agency could not secure an underwriter to renew and extend an essential insurance policy. *Id.* ¶ 126. Obria PNW's insurance agency ultimately obtained replacement coverage through a different underwriter, but, because of the pendency of the CIDs, it was at five-times the previous rate. *See id.* ¶ 127.

### F.     The Attorney General drops his investigation.

After the Obria Clinics provided a supplemental pleading alleging the increased insurance costs for Obria PNW, the Attorney General responded by sending the Clinics a letter stating that his office had decided "not to pursue litigation and to close its investigation." Closure Letter. The letter explained that while issuing such a letter was against the ordinary policy of his office, he was "making an exception in this instance to provide [the Obria Clinics] with a statement they can offer to their insurer, which will provide certainty as to the status of this investigation." *Id.* Even though the letter stated that the Attorney General had closed his investigation both as to Obria PNW and as to its vendors, he insisted "[n]o inference should be drawn" from his decision to do so. *Id.*

### ARGUMENT

## I.     The Obria Clinics' standing is beyond reasonable dispute.

The Attorney General's attack on standing is a "factual" challenge that relies on "presenting affidavits or other evidence." *Savage v. Glendale Union High Sch.,*

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1   *Dist. No. 205, Maricopa Cnty.,* 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). That means

2   that the Obria Clinics "must furnish affidavits or other evidence necessary to satisfy

3   [their] burden of establishing subject matter jurisdiction." *Id.* They have done so in

4   many ways. First, Obria PNW suffered a concrete, and redressable harm from the

5   Attorney General's investigation: a jump in its insurance premiums. Second, the

6   Obria Clinics have experienced a direct harm from the CIDs because Washington law

7   imposes sanctions for non-compliance and the Attorney General has not disavowed

8   enforcement. And third, the Obria Clinics have suffered multiple constitutional

9   harms—association, speech, and Fourth Amendment—any one of which is sufficient

10  to sustain standing.

11      **A.    Obria PNW's insurance premium increase establishes standing.**

12      Standing is clear from the increase in insurance premium that the Attorney

13  General's investigation caused for Obria PNW. When Obria PNW had to disclose the

14  CIDs in applying to renew its coverage, its insurance agency notified it "that, as a

15  direct result of truthfully acknowledging on its application that it is presently subject

16  to Defendant's CIDs, the agency was unable to secure" renewal coverage. Suppl.

17  Compl. ¶¶ 124–26; Declaration of River Sussman, Aug. 26, 2024, ECF 48 ("Second

18  Sussman Decl.") ¶ 3. Obria PNW had to look for other coverage, which it obtained

19  through a different underwriter for almost five times as much. *See* Suppl. Compl. ¶

20  128; Second Sussman Decl. ¶ 6. A loss of insurance coverage from state action is an

21  Article III injury, *Cedar Park*, 860 F. App'x at 543, and here, there is not just a loss

22  of coverage, but an ongoing premium increase. That injury is directly traceable to the

23  Attorney General's conduct and is likely to be redressed by a favorable decision. This

24  alone establishes standing.

25      The Attorney General says that this theory of standing does not work because

26  it hinges on actions of third parties and thus "Was Not Caused" and "Cannot Be

27  Redressed" by his office. Mot. to Dismiss Third Suppl. Compl. 11, ECF No. 44

28

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS                           8

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

("MTD"). Not so. The relevant standard for causation here is whether the harm from the third party is "the predictable effect of Government action on the decisions of third parties." *Department of Com.*, 588 U.S. at 768. Of course, this was predictable—an increase in insurance premiums is a natural and expected consequence of the government's decision to investigate an entity, since that investigation is a source of additional exposure and risk to the insurer.

The Attorney General's own closure letter confirms this clear causal chain. He said "an exception" to his normal policy against closure letters was warranted so Obria PNW would have "a statement they can offer to their insurer" that "will provide certainty as to the status of this investigation." Closure Letter; *see also* Hearing Tr. 51, ECF No. 31. And he sent that letter right after Obria PNW had filed a proposed supplemental complaint explaining that it had finally been able to obtain replacement coverage at an increased cost. Suppl. Compl. ¶ 128. Plainly, he wanted to give the insurer notice of his "decision not to pursue litigation and to close its investigation" so the insurer would lower Obria PNW's premium and thus erase its economic injury. Closure Letter. His own statements thus make it impossible for him to credibly deny standing.

The Attorney General distorts the law in arguing otherwise. He does not mention the controlling standard from *Department of Commerce*, but instead argues the plaintiff "must generally show that the defendant exerted a 'determinative or coercive effect on the third-party conduct that directly cause[d] the injury.'" MTD at 12 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1217 (9th Cir. 2023)). This misstates the caselaw by turning a *may* into a *must*. The *WildEarth* decision does not say that a plaintiff "must generally" show coercion to show standing, but rather that "[a] plaintiff *can* do so by showing . . . a determinative or coercive effect on the third-party conduct." 70 F.4th at 1217 (emphasis added) (cleaned up). Coercion is not a required element of standing, just one option for showing it. That's

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

why other courts have recognized standing when the defendant's actions were alleged to have caused "increased insurance premiums." *Adams Pointe I, L.P. v. Tru-Flex Metal Hose Corp.*, No. 2:16-CV-00750-CB, 2018 WL 1660743, at *4 (W.D. Pa. Mar. 21, 2018), *adopted,* 2018 WL 1640368 (W.D. Pa. Apr. 5, 2018); *accord In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, No. MDL 1672, 2007 WL 1796224, at *3 (E.D. Mo. June 20, 2007). This case is no different.

Plus, Article III ultimately "'requires no more than de facto causality.'" *Department of Com.*, 588 U.S. at 768. (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)). Obria PNW had disclosed the investigation in response to a question in its renewal application, and then the insurer specifically asked about it. Second Sussman Decl. ¶¶ 3–4. But the insurer denied both the renewal and any request for reconsideration, explaining that it had done so "[d]ue to the claims" and because of Obria PNW's disclosure of "circumstances that could lead to a claim." *Id.* ¶¶ 4–5. The insurer made that point even more clear by explaining that renewal would require an amended application showing both "no claims" and a "result of no wrong doing" from the Attorney General's investigation. *Id.* ¶ 6. Obria PNW could not make that showing for an ongoing investigation, so its insurer refused renewal with an unambiguous message of cause-in-fact: "recent civil investigative demand by the attorney general[,] we will have to stick with our declination." *Id.*

That injury still stands today. Second Sussman Decl. ¶¶ 8–9. And there is a "substantial likelihood" that an order of the Court declaring the investigation unlawful will alleviate this harm. *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 74–75 (1978). Such an order need not redress "every injury," *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982), so long as it can at least "effectuate a partial remedy." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021). Here, Obria PNW's previous insurer said it would not renew coverage without proof that the investigation found "no wrongdoing." *See* Second Sussman Decl. ¶ 6. A court order finding that

investigation unconstitutional is likely to provide that and both reduce insurance costs and give the Clinics more insurers to choose from .

The Attorney General does not maintain that the letter moots this case—indeed, that argument would be foreclosed by *FBI v. Fikre*, 601 U.S. 234 (2024). Proving mootness in that case is a "formidable burden," since a different rule would allow a defendant to "suspend its challenged conduct after being sued, win dismissal, and later pick up where it left off," repeating "this cycle as necessary until it achieves all of its allegedly unlawful ends." *Id.* at 241 (cleaned up). Because "[a] live case or controversy cannot be so easily disguised," proving mootness would require the Attorney General to show what he does not even assert: that "'no reasonable expectation remains'" that he will "return to [his] old ways." *Id.* (cleaned up). While the Attorney General has dropped the investigation, he does not disavow it, *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022), and he takes pains to say that "[n]o inference" should be drawn from his decision to stop the inquiry without explanation. Closure Letter. His threat remains in place until this Court orders otherwise. That proves standing.

**B.    The Attorney General's enforcement efforts establish standing.**

The Obria Clinics also have standing based on what the Attorney General has directly threatened. Standing based on enforcement turns on whether the plaintiff has "an actual or well-founded fear" of enforcement of the CIDs by the defendant. *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1174 (9th Cir. 2022) (quotation omitted). While *Twitter* found no standing because the Texas CIDs were not self-enforcing, this case is different because, as discussed below, compliance with Washington's CIDs is backed by the threat of immediate sanctions.

Thus, standing to challenge those CIDs turns on three factors: (1) "whether the plaintiffs have articulated a concrete plan to violate" the CID's demand; (2) "whether the prosecuting authorities have communicated a specific warning or threat to

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

initiate proceedings" to enforce the CID; and (3) "the history of past prosecution or enforcement" of such matters. *Id.* (quotation omitted). Here, there is no question that the Obria Clinics intend to refuse any further request to comply with the demands of the CIDs and deficiency letters, and the other two factors weigh heavily for standing.

The Attorney General threatens enforcement on the face of the CIDs. In the *only* bold text of his CIDs, he stated directly that "**[t]he Attorney General is authorized to enforce this demand**" and that failing to obey it "**shall subject you to sanctions as provided in RCW 19.86.110**." Obria PNW CIDs at 25. The Attorney General didn't stop there—after the Obria Clinics began producing documents, he doubled down on his demands with deficiency letters. Deficiency Notice 2, ECF No. 4-11.

Plus, even after the Obria Clinics turned over what they hoped would be their final document production, *see* Second Suppl. Answers to CIDs, ECF No. 4-13, Third Suppl. Answers to CID, ECF No. 4-14, the Attorney General made an even bigger threat. He joined an open letter against pregnancy centers led by California Attorney General Rob Bonta, *see* Open Letter, who just weeks before had filed a consumer protection action against an Obria affiliate in California. *California v. Heartbeat Int'l, Inc.*, No. 23CV044940 (Cal. Sup. Ct.). The letter suggested that similar actions were soon to follow from the other signatories, including the Attorney General. *See* Open Letter at 8. Invoking his authority to "enforce[e] . . . consumer protection laws," the Attorney General accused pregnancy centers of "misleading consumers" and pledged to "continue to take numerous actions aiming to mitigate the harmful effects of [their] misinformation." *Id.* at 1, 8. There was little way to read his actions other than as a threat of imminent litigation.

Those threats cannot be dismissed under the rationale of *Twitter*, because Washington's CIDs, unlike those of Texas, are backed by the direct threat of sanctions. The Ninth Circuit held in *Twitter* that the Texas CIDs there were "not self-

1   enforcing" because "Twitter never faced any penalties for its refusal to comply with

2   the CID" until a state court enforced them. 56 F.4th at 1176 (citing Tex. Bus. & Com.

3   Code § 17.62(b), (c)). Rather, the prospect of penalties under Texas law would come

4   only if a court entered an enforcement order and then the CID recipient flouted it.

5   Tex. Bus. & Com. Code Ann. § 17.62(c) (West 2023). Because of that requirement, the

6   Ninth Circuit said any harm from complying with the Texas CIDs was "self-inflicted"

7   since compliance was "voluntary." *Twitter*, 56 F.4th at 1176.

8       Not so for Washington's consumer-protection laws, which are much more

9   aggressive. Washington's CIDs do not just sanction disobedience of an enforcement

10  order, they punish *disobedience of the CIDs themselves*. If a "person fails to comply

11  with any civil investigative demand" and the Attorney General moves to compel

12  compliance, the law provides for "such sanctions as are provided for in the civil rules

13  for superior court with respect to discovery motions." RCW 19.86.110(9). Those civil

14  rules impose sanctions that are presumptively mandatory. The enforcing court

15  "*shall*"—not *may*—award "the moving party the reasonable expenses incurred in

16  obtaining the order, including attorney fees," unless the CID recipient shows its

17  opposition was substantially justified or some other equitable circumstance. Wash.

18  Civ. P. R. 37(a)(4) (emphasis added).

19      The Attorney General has requested and received such fees in Washington

20  state courts when a CID recipient "did not produce documents or answer

21  interrogatories in response to a CID [the court] determined to be valid." *Washington

22  v. Brelvis Consulting LLC*, 436 P.3d 818, 833 (Wash Ct. App. 2018), *amended on

23  reconsideration* (Mar. 12, 2019). That's why the Attorney General conceded at

24  argument on his prior motion to dismiss that "yes, maybe there was a risk of

25  sanctions" because "the rules allow for it." Hearing Tr. at 49. Compliance is not

26  "voluntary" when one produces documents under threat of sanctions.. MTD at 8.

27

28

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1    That presumption of sanctions matters. The Supreme Court held in *Susan B.*
2    *Anthony List v. Driehaus*, that the "combination" of threatened administrative action
3    to be followed by judicial proceedings with penalties "suffices to create an Article III
4    injury." 573 U.S. 149, 166 (2014). And as the Ninth Circuit observed in *Twitter*, it had
5    previously recognized standing in *White v. Lee*, 227 F.3d 1214, 1222 (9th Cir. 2000),
6    because, at the time of a potential enforcement action, the plaintiff "could have faced
7    a large fine." *Twitter*, 56 F.4th at 1177. In *White*, Washington state had "directed the
8    plaintiffs under threat of subpoena" to turn over extensive information, but
9    "ultimately decided not to pursue either criminal or civil sanctions." *Id.* at 1228–29
10   (cleaned up). That did not prevent the court from looking "through forms to the
11   substance of government conduct," since "the threat of invoking legal sanctions and
12   other means of coercion, persuasion, and intimidation, can violate the First
13   Amendment also." *Id.* (cleaned up). So too here for the "extraordinarily intrusive and
14   chilling measures" of the Attorney General's CID. *Id.* at 1237–38.

15   The Attorney General claims support from the Ninth Circuit's recent decision
16   recognizing standing to sue him in *SPU*, 104 F.4th 50. MTD at 8. But *SPU* only
17   reinforces standing: it held that an *informal letter* supported standing because it
18   represented "a clear sign of a substantial threat." 104 F.4th at 60. Though that letter
19   "carrie[d] no stick" because "SPU would not face sanctions for ignoring it, *id.* at 57, it
20   "caused SPU to have a real and reasonable apprehension that it will be subject to
21   liability" by suggesting that certain of SPU's practices may violate Washington law.
22   *Id.* at 60. That finding makes standing much more clear here: the Attorney General
23   plainly wields a "stick," since his formal CIDs and subsequent deficiency letters carry
24   a threat of sanctions that is "hardly without consequence" and "clearly raise[s] the
25   specter of potential . . . judicial proceedings." *Id.* at 57, 61. Standing is plain.

26   Enforcement history also supports standing because the Attorney General
27   conducts robust enforcement of CIDs under the CPA. He files enforcement actions,
28   
PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS                               14

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

prosecutes them on appeal, and seeks attorneys' fees for his trouble. *See, e.g.*, *Brelvis*, 436 P.3d at 833; *Matter of Confidential Consumer Prot. Investigation*, 512 P.3d 904, 915 (Wash. App. Div. 3, 2021). And this is not the first case in which the Attorney General has tried to enforce the CPA against protected speech—he went against Value Village all the way to the Washington Supreme Court, where he lost and then had to pay $5.7 million in fees for his "dismissive stance" against the First Amendment. *Washington v. TVI, Inc.*, 524 P.3d 622, 634 (Wash. 2023) (en banc); *State v. TVI, Inc.*, No. 17-2-32886-3 SEA, slip op. at 18–19 (Wash. Super. Aug. 9, 2023). And he has not "disavowed enforcement" of the CIDs here either. *Tingley*, 47 F.4th at 1068. Instead, he has sought to drop them without consequence, demanding that "[n]o inference" be made from his decision to do so. Closure Letter. The law does not let him litigate to the edge of a decision and then withdraw at the precipice to escape a binding adjudication. *Fikre*, 601 U.S. at 241. The threat of enforcement still looms, and the Obria Clinics have standing to challenge it.

### C.   The Attorney General inflicted multiple constitutional harms.

#### 1.   Harm to the Obria Clinics' associational freedom.

The Attorney General has harmed the Obria Clinics' associational rights by demanding, on threat of sanctions, that they disclose the identity of everyone associated with them—both their leadership and their "members, employees, . . . and volunteers" too. *See* Obria PNW CIDs at 11. The Attorney General renewed his demands for this information in his deficiency letters while highlighting sanctions for non-compliance. *See* Deficiency Notice at 3. This attempt at "compelled disclosure" of sensitive internal information about a nonprofit's relationships with members and volunteers is a per se harm to its protected associations. *Ams. for Prosperity*, 594 U.S. at 607; *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 462 (1958); *Perry*, 591 F.3d at 1152.

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

That per-se harm has had practical consequences. One of Obria PNW's mission-aligned vendors, a faith-based provider of search-engine marketing and optimization, was advised by his attorneys "that he needed to allow the dust to settle on Obria PNW before continuing to provide services to them," leading him to pause all work for Obria PNW for several months. First Sussman Decl. ¶ 4 (quotations omitted); *Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1460 (9th Cir. 1991) (associational harm exists where "knowledge that [individuals'] comments would be subject to scrutiny by the government" led them to diminish their associational activities). If threatened government action "implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing," *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000), since chilling those "rights is, itself, a constitutionally sufficient injury." *Libertarian Party of L.A. Cnty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013). This threat to protected association confers standing.

## 2. Harm to the Obria Clinics' freedom of expression.

The Obria Clinics have also been harmed by the CIDs through the "objectively reasonable chilling of [their] speech." *Twitter*, 56 F.4th at 1178 n.3. Standing for speech injuries is not "rigid" and presents "unique standing considerations." *Tingley*, 47 F.4th at 1066–67 (cleaned up). "[T]he Supreme Court has endorsed . . . a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." *Arizona Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003). "Were it otherwise, free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Id.* (quotation omitted). Thus, whether the plaintiff "was, or would have been, chilled is not the test," but rather whether the defendant's actions "would chill a person of ordinary firmness." *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) (quotation omitted). That standard is easily met here.

Choosing to stop speaking is a reasonable response to a broad demand for vast troves of largely confidential information. That is especially so where the Attorney General has threatened both an enforcement action and sanctions under state law, Obria PNW CIDs at 25, which presumptively include attorneys' fees and other expenses. RCW 19.86.110(9); Wash. Civ. P. R. 37(a)(4). The likely consequence is easy to see—"fearing the arrival of subpoenas" may lead speakers to "think[] twice" before opening their mouths, which "[o]ne might suspect . . . is the whole point" of serving such demands. *Smith & Wesson Brands, Inc. v. Attorney Gen. of N.J.*, 27 F.4th 886, 896–97 (3d Cir. 2022) (Matey, J., concurring). Here too, the Attorney General's message was clear: comply with an unreasonable document demand or suffer the consequences. The chilling effect of that demand confers standing.

Plus, the CIDs "actually chilled" the Obria Clinics' speech. *Cf. Twitter*, 56 F.4th at 1175; Suppl. Compl. ¶¶ 119–23. Obria PNW "has previously spoken about APR and would like to more prominently publicize [its] availability to assist pregnant women who wish to stop a chemical abortion and continue their pregnancies." Suppl. Compl. ¶¶ 118–19. Yet as a direct result of AG Ferguson's investigation, Obria PNW "has not made any further public statements about APR due to fear of reprisal" from the Attorney General. *Id.* ¶ 120. Were it not for that investigation, the Obria Clinics would have "prepare[d] a brochure of materials on the safety and efficacy of APR to be distributed on social media, at its clinics, and elsewhere." *Id.* But it has forgone that project because of the Attorney General's investigation. *Id.*

And "in an effort to limit [its] potential exposure to reprisal from [the Attorney General] for advertising [its] services, including APR, Obria PNW has discontinued operating its own website" and "instead relies upon the Obria Group to host a website listing its services." *Id.* ¶¶ 121–22. The *NIFLA* court just held that chilling of speech about APR gave rise to standing even when the government had not acted against

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

the plaintiff pregnancy centers. *See* 2024 WL 3904870, at *5–6. That is also true here where the Attorney General put the Obria Clinics in his crosshairs with his CIDs.

The Attorney General tries to move the goalposts by saying there is no chilling because "Obria PNW has not discontinued its online presence" and the national website still contains speech about APR. MTD at 9. This is flawed for many reasons. For one, the legal test is "generic and objective," not subjective. *O'Brien*, 818 F.3d at 933. For another, nothing the Attorney General says refutes Obria PNW's allegations that it stopped making its own speech about APR and abandoned plans for a marketing campaign based on APR. *Id.* ¶¶ 118–22. And chilled speech does not require one to stop speaking altogether. Here, for example, the Attorney General's actions led Obria PNW to cease certain speech and decline to speak more about APR. The statements Obria PNW is making now via the national website are not the same statements that it made before on its own, now-abandoned website. Suppl. Compl. ¶¶ 118–22.

### 3.    Harm to the Obria Clinics' Fourth Amendment rights.

Finally, the Obria Clinics have experienced harm to their Fourth Amendment right to privacy in their papers and effects—that is, the right to be free from unreasonable searches. *Major League Baseball*, 331 F.3d at 1180–81; U.S. Const. amend. iv. The Obria Clinics seek an injunction that would spare them from any further document production. They have "possessory rights over the property searched"—here, the private, sensitive documents that the Attorney General demanded in his deficiency letters and that the Clinics have not yet produced. *Lyall v. City of L.A.*, 807 F.3d 1178, 1186 (9th Cir. 2015). And the threat of further harm to those possessory rights furnishes standing. *Melendres v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012).

1  **II.    The Obria Clinics have pled cognizable claims.**

2      To survive a Rule 12(b)(6) motion, a plaintiff need only plead "sufficient factual

3  matter, accepted as true, to state a claim to relief that is plausible on its face."

4  *O'Brien*, 818 F.3d at 933 (cleaned up). This requires sufficient "factual content" for

5  "the court to draw the reasonable inference that the defendant is liable for the

6  misconduct alleged." *Id.* In addition to the factual allegations of the Complaint, the

7  Court "may consider documents referred to in the complaint or any matter subject to

8  judicial notice," including government records. *Dreiling v. American Express Co.*, 458

9  F.3d 942, 946 n.2 (9th Cir. 2006). The Clinics' claims easily clear this low bar.

10      **A.    The Obria Clinics have pled cognizable association claims.**

11      The Attorney General's actions have infringed on the Obria Clinics' "freedom

12  to associate with others for the common advancement of political beliefs and ideas,"

13  which "lies at the heart of the First Amendment." *Perry*, 591 F.3d at 1152. Once a

14  plaintiff alleges harm to its association rights, as the Clinics have here, *see supra* §

15  I.C.1, the burden shifts back to the government to justify its demand. *Brock v. Local

16  375, Plumbers Int'l Union of Am., AFL-CIO*, 860 F.2d 346, 350 (9th Cir. 1988);

17  *Americans for Prosperity*, 594 U.S. at 607; *Perry*, 591 F.3d at 1161. Doing so requires

18  the Attorney General to show—at least—that his demand meets "exacting scrutiny."

19  *Americans for Prosperity*, 594 U.S. at 607 (plurality op.).

20      Exacting scrutiny demands "a substantial relation between the disclosure

21  requirement and a sufficiently important governmental interest." *John Doe No. 1 v.

22  Reed*, 561 U.S. 186, 196 (2010) (cleaned up). "To withstand this scrutiny, the strength

23  of the governmental interest must reflect the seriousness of the actual burden on

24  First Amendment rights." *Id.* (cleaned up). Plus, any such compelled disclosure must

25  be "narrowly tailored to the government's asserted interest." *Americans for

26  Prosperity*, 594 U.S. at 608 (plurality op.). This high bar "is appropriate given the

27

28

deterrent effect on the exercise of First Amendment rights that arises as an inevitable result of the government's conduct in requiring disclosure." *Id.* at 607. The Clinics have pled facts for their association and privilege claims that plausibly show the Attorney General's actions fail this test.

The Attorney General's demand that the Clinics disclose the identities of their members and volunteers is the quintessential example of violating "the free enjoyment of the right to associate." *NAACP*, 357 U.S. at 466. And while the Attorney General relies on the Ninth Circuit's decision in *Perry*, MTD at 22, he omits that that case rejected a demand just like his. Under a First Amendment privilege framework, *Perry* held it was "clearly erroneous" to compel disclosure of the identities of leadership and high-level members of an initiative campaign. *Perry*, 591 F.3d at 1159. Such protected information could be obtained only if it was "highly relevant to the claims or defenses in the litigation." *Id.* at 1161. Yet while the district court had protected the identities of "rank-and-file members and volunteers," it had allowed discovery of the identities of leadership on a showing of mere relevance. *Id.* at 1164. That analysis failed to "give sufficient weight to the First Amendment interests at stake" and if accepted, would have "a chilling effect on political association and the formulation of political expression" without a showing of "sufficient need for the information." *Id.* at 1164–65. The Ninth Circuit thus granted the extreme relief of mandamus to prohibit the disclosure. *Id.* at 1165.

The Attorney General's demand for the protected association information of the Obria Clinics is even more serious than *Perry*. He does not just seek leadership identities—certain of which the Obria Clinics have disclosed—but also demands the identities of rank-and-file members and volunteers, which not even the district court in *Perry* thought were relevant. Obria PNW CIDs at 11. That demand presents the greatest risk to Obria PNW, where its personnel within Washington state may be subject to repercussions from disclosure. And he goes even further by demanding that

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

the Obria Clinics turn over the notices, agendas, and minutes for every board meeting and every other medical, executive, and operations meeting within the last ten years. Obria PNW CIDs at 19; *cf. Perry*, 591 F.3d at 1152 (quashing similar demand for disclosure of "internal campaign communications"). In other cases, defendants have at least tried to justify their demands for such information—in *Perry*, with the purported need to investigate bias, 591 F.3d at 1161, and in *NAACP*, the desire to enforce a corporate registration statute, 357 U.S. at 464–65. But here, the Attorney General has provided no purpose for which he needs this information, much less shown how his requests are "narrowly tailored" to achieve it. *Americans for Prosperity*, 594 U.S. at 608 (plurality op.).

Instead, the Attorney General attempts to distract. He tries to dismiss the Obria Clinics as raising a mere business association claim, not an expressive association claim. MTD at 20–22. But the damage to vendor relationships that the Clinics cite is primarily evidence of the underlying harm to association: the Attorney General's demand for identities of leadership, "members, employees, contractors, and volunteers," which the Clinics allege was unlawful. Suppl. Compl. ¶¶ 105(d), 147. Plus, the Obria Clinics pled the close expressive relationship of Christian belief that exists within and between these individuals (and vendors) associated with them. *Id.* ¶¶ 48–61, 142–44. And they alleged in their First Amendment privilege claim that "[c]ompelled disclosure of associations adversely affects protected speech and association by inducing members to withdraw from the association and dissuading others from joining it for fear of exposure of their beliefs." *Id.* ¶ 160. The Attorney General's attempt to write these harms off as mere commercial interests is untenable.

## B.    The Obria Clinics have pled plausible retaliation claims.

A retaliation claim requires three elements: the plaintiff (1) "was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

21

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

of ordinary firmness from continuing to engage in the protected activity and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*, 818 F.3d at 932 (quotation omitted). "Once a plaintiff has made [that] showing, the burden shifts to the government to show that it 'would have taken the same action even in the absence of the protected conduct.'" *Id.* (quotation omitted); *accord Boquist*, 32 F.4th at 777. The Obria Clinics have pled facts that support these elements and show the Attorney General has not met his burden.

*First*, the Attorney General does not dispute that the Obria Clinics' speech about APR is protected. Indeed, it was because of this same protected speech "about how a woman might save her pregnancy" that the *NIFLA* court enjoined the New York Attorney General from pursuing pregnancy centers under consumer protection theories. 2024 WL 3904870, at *12. "The First Amendment protects Plaintiffs' right to speak freely about APR protocol and, more specifically, to say that it is safe and effective for a pregnant woman to use in consultation with her doctor." *Id.* at *10. The same is true here.

*Second*, though the Attorney General denies it now, his own writings establish causation. His consumer alert emphasizes his fundamental problem with pregnancy centers. He says Washingtonians should "[b]eware of clinics that claim to offer reproductive health care but refuse to perform abortions or give abortion referrals"— that is, they should beware of any clinic with pro-life views. Consumer Alert at 2. Plus, his CIDs here specifically draw the causal connection to protected speech by stating on their face that he is investigating "representations relating to Abortion Pill Reversal." Obria PNW CIDs at 1. And his open letter reinforces both points: his first-page objection to pregnancy centers is that they "do not provide abortions or abortion services," Open Letter at 1, and he dismisses their views about APR as "misinformation." *Id.* at 4 (claiming "[t]here is no credible science or evidence" to

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

22

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

support pregnancy centers' claims that progesterone "can 'reverse' the effects" of mifepristone).

*Third*, the same open letter also shows that his actions would chill a person of ordinary firmness. It specifically cites California's efforts to sue other pregnancy centers under consumer protection law for making statements that APR works. *Id.* at 3 n.16. And it pledges to "continue to take numerous actions aiming to mitigate the harmful effects of [pregnancy center] misinformation." *Id.* at 8. Such efforts are specifically calculated to stop the same speech about APR that the Attorney General's investigation chilled here. It is hard to see how the Attorney General's service of a consumer protection CID about APR would not reasonably have such a chilling effect. Nor would the purportedly "robust procedural protections" of Washington state court stop that chill, MTD at 17, especially when those "robust procedural protections" come with presumptively mandatory sanctions for non-compliance. *See supra* § I.B.

*Fourth*, the Clinics' allegations and the law show that he has engaged in retaliatory enforcement. The Attorney General tries to distinguish *Frederick Douglass* because it involved "two different groups [who] protested publicly, saying "in one instance that 'Black Lives Matter,' and in the other that 'Black Pre-Born Lives Matter.'" MTD at 20 (citing 82 F.4th at 1138). But the same side-by-side comparison applies here: Planned Parenthood and the Obria Clinics both provide many of the same services to women, but Planned Parenthood says abortion is healthcare while the Obria Clinics say it takes the life of an unborn baby. Just like in *Frederick Douglas*, the Attorney General takes sides in that dispute: he has publicly allied himself with Planned Parenthood, Suppl. Compl. ¶ 86, while he warns consumers to "beware" of pregnancy centers like Obria because they "refuse to perform abortions." Consumer Alert at 2. And he didn't stop with just stating his views—he took state action by commencing a consumer protection investigation against the Obria Clinics

for saying that APR was effective and for unspecified "unfair acts or practices related to the collection and use of consumer data." Obria PNW CIDs at 1.

If anything, as in *Frederick Douglass*, any meaningful difference in the "legitimate prosecutorial factors" between Planned Parenthood and Obria cuts against the Attorney General. 82 F.4th at 1137. Planned Parenthood charges for its services and has a well-publicized history of patient data breaches. Suppl. Compl. ¶ 117. Yet the Attorney General decided to investigate a pro-life pregnancy center that provides only free services and that has no such history (nor any allegation otherwise). *Id.* ¶ 5. Plus, the Attorney General has left alone Planned Parenthood's commercial activity in charging for abortions, which is undisputedly subject to the CPA. Instead, he chose to investigate the speech of religious nonprofits "about how a woman might save her pregnancy" that could not be "less commercial." *NIFLA*, 2024 WL 3904870, at *12. Under *Frederick Douglass*, this "lopsided prosecutorial response" is devastating to the Attorney General. 82 F.4th at 1138.

Similarly, the Attorney General says the Supreme Court's unanimous decision in *Vullo* helps him because it shows that "Attorneys General are elected officials and are not required 'to maintain viewpoint-neutrality.'" MTD at 18 (quoting *Vullo*, 602 U.S. at 187)). But he ignores the crucial sentences that follow: while a government official may "share her views freely and criticize particular beliefs," she cannot "use the power of the State to punish or suppress disfavored expression." 602 U.S. at 188. And just as in *Vullo*, that means a government official who has expressed his views publicly and then acted against a speaker with opposing views cannot justify the action by claiming that their views are just "permissible government speech." *Id.* at 194. Rather, the official's speech must be evaluated "against the backdrop of other allegations," including official actions taken against those with opposing views. *Id.* at 195. In *Vullo*, the government's hostility to the NRA's expression, coupled with

PLAINTIFFS' BRIEF IN OPPOSITION TO
MOTION TO DISMISS

24

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

coercive state action, would have pled a retaliation claim. *See id.* at 203–204 (Jackson, J., concurring). That is just as true here.

### C.     The Obria Clinics have pled valid Fourth Amendment claims.

In every context, the Fourth Amendment demands an evidentiary basis for a search. Justice Holmes explained a century ago that "[a]nyone who respects the spirit as well as the letter of the Fourth Amendment" understands that it does not permit the government to "direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *Federal Trade Comm. v. American Tobacco Co.*, 264 U.S. 298, 305–06 (1924). "It is contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Id.* at 306.

Thus, the validity of a government investigation under the Fourth Amendment depends on whether it is supported by an adequate basis in the law and is within "the agency's jurisdiction." *Consumer Fin. Prot. Bureau v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689 (D.C. Cir. 2017). Courts have also applied that standard to CIDs, describing "[t]he level of proof required of the investigative agency" as "something more than a fishing expedition, and something less than probable cause." *Major League Baseball*, 331 F.3d at 1187 (quotation omitted). The agency must have "specific grounds for its suspicion of liability." *In re McVane*, 44 F.3d 1127, 1140 (2d Cir. 1995); *accord Resolution Tr. Corp. v. Walde*, 18 F.3d 943, 949 (D.C. Cir. 1994). Here, the Attorney General cites none.

The Clinics pled the absence of adequate grounds, and the Attorney General's failure to provide any dooms his motion to dismiss. He says he need not make that showing, MTD at 20, but the law is to the contrary. If an investigative demand is challenged under the Fourth Amendment, "a ground must be laid and the ground and the demand must be reasonable." *American Tobacco*, 264 U.S. at 306. Rather than

make the required showing, the Attorney General focuses on a variety of other purported issues he has with the Obria Clinics' Fourth Amendment claim. He says that Obria has remedies in state court, MTD at 22, that he did not need a complaint to investigate, *id.* at 23, that the CPA applies here, *id.*, that there is no statute of limitations for him, *id.*, and that his CIDs are not overbroad, *id.* at 23–24. But all of those questions are irrelevant without answering one critical threshold question: *what was his evidence that the Obria Clinics may have violated the law*, such that he had a right to demand they produce their papers and effects in the first place? That question demands an answer the Attorney General has not provided.

## CONCLUSION

The Court should deny the Attorney General's motion to dismiss.

\* \* \* \*

I certify that this memorandum contains 8,394 words, in compliance with the Court's September 20, 2024 Order.

Respectfully submitted this 11th day of October, 2024.

/s/ *Lincoln Davis Wilson*

Kristen K. Waggoner, Wa. Bar No. 27790
Lincoln Davis Wilson, Wa. Bar No. 53764
Timothy A. Garrison (admitted pro hac vice)
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
kwaggoner@ADFLegal.org
lwilson@ADFLegal.org
tgarrison@ADFLegal.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nathaniel L. Taylor, Wa. Bar No. 27174
Abigail St. Hilaire, Wa. Bar No. 48194
ELLIS, LI & MCKINSTRY PLLC
1700 7th Ave Suite 1810
Seattle, WA 98101
Telephone: 206-682-0565
ntaylor@elmlaw.com
asthilaire@elmlaw.com

*Counsel for Plaintiffs*

ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690

1

**CERTIFICATE OF SERVICE**

2

I certify that on October 11, 2024, I caused a true and correct copy of the

3

foregoing document to be served via ECF upon all counsel of record.

4

5

DATED: October 11, 2024.                    */s/ Lincoln Davis Wilson*
                                            Lincoln Davis Wilson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Brief in Opposition to          Alliance Defending Freedom
Motion to Dismiss                    28     440 First Street NW, Suite 600
                                            Washington, DC 20001
                                            (202) 393-8690