1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

OBRIA GROUP, INC.; MY CHOICES,

              Plaintiff,

    v.

ROBERT FERGUSON,

              Defendant.

Case No. 3:23-cv-06093-TMC

ORDER GRANTING MOTION TO
DISMISS

## I.  INTRODUCTION

Plaintiffs Obria Group, Inc. and My Choices (doing business as Obria Medical Clinics PNW) operate clinics across several states, including Washington, that are sometimes referred to as "crisis pregnancy centers." Plaintiffs' licensed clinics offer some reproductive health services (such as certain types of ultrasounds and testing for sexually transmitted infections) but, per their policies, do not offer, recommend, or refer patients for abortions or any medications they consider to be abortifacients.

In May 2022, the Consumer Protection Division of the Washington Attorney General's Office served civil investigative demands (CIDs) on each plaintiff, stating that the Attorney General was investigating possible unfair or deceptive acts arising from "representations relating

ORDER GRANTING MOTION TO DISMISS - 1

1    to Abortion Pill Reversal" and "the collection and use of consumer data." Dkt. 43 ¶¶ 101–03.

2    The CIDs contained broad requests for information and documents about Plaintiffs' clinics.

3        The same Washington statute that authorizes the Attorney General to issue CIDs provides

4    a process for the recipient to ask a state court to "modify or set aside" a CID if it contains

5    "unreasonable or improper" demands. RCW 19.86.110(3)(a), (8). Plaintiffs did not use that

6    process. Instead, Plaintiffs' counsel negotiated with the Attorney General's Office, ultimately

7    producing some information and documents while objecting to other requests. Plaintiffs' last

8    supplemental production was in June 2023. The Attorney General's Office never moved to

9    enforce the CIDs in court and has not requested anything further from Plaintiffs since the June

10   2023 production. *See* Dkt. 43 ¶ 115.

11       Instead, at the end of November 2023, Plaintiffs filed this lawsuit and a motion for

12   preliminary injunction asking the Court to enjoin the Attorney General "from taking any further

13   action to enforce the Civil Investigative Demands." Dkt. 1, 4. The Attorney General opposed the

14   motion and moved to dismiss the case. Dkt. 21. The Court held a combined hearing on the

15   preliminary injunction motion and the motion to dismiss on February 29, 2024. Dkt. 28.

16       But before the Court could issue a decision, the parties filed a series of stipulated motions

17   allowing Plaintiffs to amend their complaint to address new factual developments—namely,

18   Plaintiffs' alleged loss of insurance coverage and the Attorney General's decision to issue

19   Plaintiffs a "closure letter" confirming that the investigation had ended and no further responses

20   to the CIDs would be necessary. *See* Dkt. 33, 36, 37, 38, 39, 41. In Plaintiffs' operative Third

21   Amended Complaint (Dkt. 43), they dropped their pursuit of a preliminary injunction but sought

22   "[a] permanent injunction prohibiting Defendant from resuming his investigation or enforcement

23   against Plaintiffs." Dkt. 43 at 29. The Attorney General again moved to dismiss. Dkt. 44.

24

After a protracted briefing schedule arising from Plaintiffs' decision to file but then withdraw an affirmative motion for summary judgment (*see* Dkt. 46–59), the pending motion to dismiss is now ready for decision. Having considered the parties' briefing, the balance of the record, and the relevant law, the Court concludes that Plaintiffs' complaint must be dismissed because their claims are not ripe under the Ninth Circuit's binding precedent in *Twitter v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), which was recently reaffirmed in *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50 (9th Cir. 2024). As in *Twitter*, Plaintiffs here have "not suffered an Article III injury because the CID is not self-enforcing," and "to complain about the CID in this posture is to speculate about injuries that have not and may never occur." *Id.* at 1176. Additionally, Plaintiffs' alleged increased insurance premium cannot confer Article III standing because it is not redressable by the injunction Plaintiffs seek. The Court therefore GRANTS the Motion to Dismiss (Dkt. 44) and DISMISSES the complaint without prejudice for lack of jurisdiction.

## II.    BACKGROUND

### A.    Obria Group and Abortion Pill Reversal

Plaintiff Obria Group, Inc. is a Christian pro-life nonprofit organization and umbrella entity for twenty-two affiliate health care clinics across seven states, including Washington. Dkt. 43 ¶¶ 21, 29, 34, 48. Plaintiff My Choices d/b/a Obria Medical Clinics PNW is an affiliate entity with three offices and a mobile clinic in Washington. *Id.* ¶¶ 35, 37, 42, 44–45. Plaintiffs' clinics provide the following services:

> [P]regnancy options counseling; sexually transmitted disease (STD)/sexually transmitted infection (STI) testing and referral; ultrasounds to confirm pregnancy, detect fetal heartbeat, determine fetal age, due date, and location of the pregnancy; prenatal care; well-woman examinations; fatherhood counseling; optimal health education and coaching; childbirth classes; postpartum, post-abortion, and miscarriage support; resources, material goods, and community support; and adoption referrals.

1

2

*Id.* ¶ 62. As alleged in the complaint, pursuant to the Obria Group Organizational Policy Manual, Obria clinics "do not offer, recommend, or refer for abortions or abortifacients," but do provide "accurate information about abortion procedures, contraception, and risks." *Id.* ¶ 63.

Obria clinics also provide information about and referrals for a treatment they describe as "Abortion Pill Reversal" (APR). *Id.* ¶ 68. APR is a process where, shortly after taking mifepristone to induce abortion, the pregnant person takes progesterone to try and counter the effects of mifepristone and sustain the pregnancy. *Id.* Obria asserts, however, that it does "not provide APR or profit from referrals for it." *Id.* ¶ 69.

**B.    Civil Investigative Demands**

The Washington Consumer Protection Act (CPA) authorizes the Attorney General to investigate possible consumer protection violations. *See generally* RCW 19.86.110. When the Attorney General believes someone has knowledge, information, or materials relevant to such an investigation, the Attorney General is authorized to issue a CID "requiring such person to produce such documentary material and permit inspection and copying, to answer in writing written interrogatories, to give oral testimony, or any combination of such demands pertaining to such documentary material or information." RCW 19.86.110(1). With each demand, the Attorney General must identify "the statute and section or sections thereof, the alleged violation of which is under investigation, and the general subject matter of the investigation," and satisfy several other obligations as to the contents and service of CIDs. RCW 19.86.110(2).

The statute provides that no CID shall "[c]ontain any requirement which would be unreasonable or improper if contained in a subpoena duces tecum, a request for answers to written interrogatories, or a request for deposition upon oral examination issued by a [Washington] court" or "[r]equire the disclosure of any documentary material which would be

privileged, or which for any other reason would not be required by a subpoena duces tecum issued by a court of this state." RCW 19.86.110(3)(a),(b). The party served with a CID may petition the state court to "modify or set aside" a CID or require the Attorney General to comply with its obligations regarding CIDs "before the return date specified in the demand, or within twenty days after the demand has been served, whichever period is shorter." RCW 19.86.110(8).

On May 19, 2022, the Consumer Protection Division of Washington's Office of the Attorney General issued a CID to each Plaintiff. *See* Dkt. 43 ¶ 101. The CIDs, made pursuant to RCW 19.86.110, stated that the Attorney General was investigating potential violations of the CPA, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* ¶ 102. The CIDs focused on "unfair or deceptive acts and practices with respect to the marketing, advertising, and other representations concerning services provided to Washington consumers, including, without limitation, representations relating to Abortion Pill Reversal" and "unfair acts or practices related to the collection and use of consumer data." *Id.* ¶ 103.

The CIDs contained interrogatories about Plaintiffs' business structure, personnel, tax returns, financial statements and disclosures, and documents reflecting transfers among affiliate organizations. *Id.* ¶ 105. In addition, the CIDs included requests for production of materials relating to similar topics from January 1, 2010 to present. *Id.* ¶ 104.

Obria PNW and Obria Group responded to their respective CID in July 2022, each asserting objections. *Id.* ¶ 109. They supplemented their responses the following week, maintaining many of their objections. *Id.* ¶ 110. Obria PNW also provided a second supplemental response. *Id.* On April 19, 2023, the Attorney General issued a deficiency letter to each Plaintiff. *Id.* ¶ 114. Each Plaintiff supplemented its response once more on June 16, 2023.

*Id.* ¶ 115. Plaintiffs, however, did not petition to modify or set aside the CIDs under RCW 19.86.110(8). *See* Dkt. 43.

Plaintiffs now allege that since receiving the CIDs, Obria PNW has discontinued hosting its own website and now lists its services through the Obria Group website. *Id.* ¶¶ 121–22. They claim that Obria PNW has refrained from making further public statements about APR or producing informational materials on APR for distribution on social media, at its clinics, and elsewhere in violation of their First Amendment free speech rights. *Id.* ¶ 120.

The Attorney General has also issued CIDs to individuals and entities Plaintiffs identified in their responses, including marketing and website design companies. *Id.* ¶¶ 111–12. Plaintiffs assert the CIDs unfairly targeted their associates in violation of their First Amendment freedom of association. *Id.* ¶ 139. Plaintiffs allege that "[u]pon receiving the CIDs, representatives from certain of these companies reached out to Plaintiffs and expressed their dismay and displeasure about having to pay attorneys' fees after getting caught up in a government investigation because of their association with Plaintiffs, and as a result, Plaintiffs have not used the services of certain of those organizations since." *Id.* ¶ 113. But Plaintiffs clarify later that "Obria PNW has reduced or eliminated its contracts with vendors who provide their website hosting" because it "outsource[ed its] website needs to the Obria Group." *Id.* ¶ 123.

Lastly, Plaintiffs allege that in its application to renew certain insurance policies, Obria PNW was required to disclose the CIDs. *Id.* ¶ 124. Obria PNW asserts, however, that it was unable to supplement its application to explain that the investigation had concluded without an adverse finding, claim, or enforcement action against it. *Id.* ¶ 125. On March 21, 2024, Obria PNW was informed that because "it is presently subject to Defendant's CIDs, the [insurance] agency was unable to secure an underwriter to renew and extend an essential insurance policy." *Id.* ¶ 126. Obria PNW ultimately obtained a different underwriter, but Plaintiffs allege "because

of the pendency of Defendant's CIDs, it was at a cost more than seven times higher than the premiums for the same insurance coverage prior to the commencement of Defendant's investigation." *Id.* ¶ 128.

## III.    DISCUSSION

**A.    Legal Standards**

*1.    Rule 12(b)(1) Motions*

A Rule 12(b)(1) motion seeks dismissal of a claim for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). Such challenges may be either "facial" or "factual." "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)). "A factual attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* (cleaned up). When, as here, the Court considers factual attacks on subject matter jurisdiction, plaintiffs "must present 'affidavits or any other evidence necessary to satisfy [their] burden of establishing that the court, in fact, possesses subject matter jurisdiction.'" *Edison v. United States*, 822 F.3d 510, 517 (9th Cir. 2016) (alteration in original) (quoting *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009)). "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). "[I]f the existence of jurisdiction turns on disputed factual issues, the district court may resolve those factual disputes itself," unless the disputed facts are intertwined with the merits of the plaintiff's claims. *Leite*, 749 F.3d at 1121–22. Here, Plaintiffs rely on their verified

complaint to oppose the Attorney General's Rule 12(b)(1) motion. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132 n.16 (9th Cir. 2000) (en banc) (verified complaint may serve as affidavit to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence).

### 2.    Standing

Article III of the U.S. Constitution limits the Court's jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the party bringing the case must have standing. *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021). Standing is "an indispensable part of the plaintiff's case . . . [and] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

The "irreducible constitutional minimum" of Article III standing requires the plaintiff to show the following three elements: "(1) [the plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To establish standing to seek injunctive relief, a plaintiff must demonstrate "a risk of future harm" that "is sufficiently imminent and substantial." *Id.* at 435.

### 3.    Ripeness

Ripeness is also a justiciability requirement "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 944 (9th Cir. 2021) (cleaned up). "The 'basic rationale' of the ripeness requirement is 'to prevent the courts, through avoidance of premature

adjudication, from entangling themselves in abstract disagreements.'" *Twitter*, 56 F.4th at 1173 (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)). Constitutional ripeness, drawn from Article III limitations, "is synonymous with the injury-in-fact prong of the standing inquiry." *Id.* (quoting *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 n.2 (9th Cir. 2003)). Prudential ripeness assesses "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Irritated Residents*, 10 F.4th at 944 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

**B.    Plaintiffs have not established constitutional ripeness.[1]**

To demonstrate constitutional ripeness, the plaintiff must identify an injury in fact, which is "an invasion of a legally protected interest that is (a) concrete and particularized[,] and (b) actual or imminent, not conjectural or hypothetical." *Twitter*, 56 F.4th at 1173 (quoting *Lujan*, 504 U.S. at 560). Courts "appl[y] the requirements of ripeness and standing less stringently in the context of First Amendment claims." *Id.* at 1173–74 (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010)). But a plaintiff cannot establish the ripeness of a First Amendment claim simply "by nakedly asserting that his or her speech was chilled[.]" *Id.* at 1174 (quoting *Getman*, 328 F.3d at 1094). "Mere allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (cleaned up).

---

[1] The Attorney General frames this argument as one of standing rather than ripeness. *See* Dkt. 44 at 8 ("Obria's claims are non-justiciable and should be dismissed for lack of standing . . . ."). As explained previously, the injury-in-fact prong of standing is synonymous with constitutional ripeness, and the Ninth Circuit in *Twitter* and *Seattle Pacific University* uses the doctrines interchangeably. *See, e.g.*, *Twitter*, 56 F.4th at 1173; *Seattle Pacific*, 104 F.4th at 57. Here, the Court frames the question as one of ripeness because that is the framing used by *Twitter*, the closest analogue to this case.

ORDER GRANTING MOTION TO DISMISS - 9

The Ninth Circuit has established two different frameworks to analyze an injury in fact "predicated on the anticipated enforcement of the challenged statute in the future" as opposed to an injury in fact resulting from an Attorney General's investigatory probe. *Seattle Pac. Univ.,* 104 F.4th at 57, 59.

When "injuries are predicated on the anticipated enforcement of the challenged statute in the future and the resulting chilling effect in the present[,]" a pre-enforcement framework is applied. *Id.* at 59. "[P]re-enforcement standing hinges on whether a party has 'alleged a sufficiently imminent injury for the purposes of Article III.'" *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 151 (2014)). To establish a credible threat of enforcement, "(1) a plaintiff must allege an intention to engage in a course of conduct arguably affected with a constitutional interest, (2) a plaintiff's intended future conduct must be arguably . . . proscribed by [the] statute it wishes to challenge, and (3) the threat of future enforcement must be substantial." *Id.* (cleaned up).

In contrast, alleged injuries arising from an Attorney General's investigation are based on a "retrospective theory [that] requires [courts] to disregard any threat of future enforcement and focus on the Attorney General's past actions—namely the request letter and the general investigation so far." *Id.* at 57. Since the state Attorney General's past actions are the basis of the claims, the Ninth Circuit applies a retaliatory framework. *See Twitter*, 56 F.4th at 1175. Under the retaliatory framework, courts "focus[] directly on the three elements that form the 'irreducible constitutional minimum' of Article III standing." *Id.* at 1174. "In the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" *Id.* (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022)).

ORDER GRANTING MOTION TO DISMISS - 10

In *Seattle Pacific University v. Ferguson*, the Ninth Circuit applied both frameworks in evaluating Seattle Pacific University (SPU)'s claims against the Attorney General. 104 F.4th at 57–61. First, SPU asserted that the Attorney General's anticipated enforcement of the Washington Law Against Discrimination (WLAD) violated its First Amendment rights. *Id.* Specifically, SPU alleged it intended to continue employment practices that were arguably prohibited by the WLAD and thus faced a substantial threat of enforcement by the Attorney General. *Id.* at 59–60. The Ninth Circuit agreed that the plaintiff had alleged a sufficiently imminent injury and concluded that the plaintiff had standing for "prospective pre-enforcement claims challenging the impending enforcement of the WLAD." *Id.* at 56, 61. Second, SPU alleged that the Attorney General's request for documents violated its First Amendment rights because the investigation chilled religious exercise and intruded on religious autonomy. *Id.* at 57. Applying the retaliatory framework, the Ninth Circuit concluded that SPU lacked standing for these claims because it failed to state an injury in fact. *Id.* Since "the Attorney General's request for documents carries no stick" as it is not self-enforcing, the Ninth Circuit found that the claimed injuries were too speculative. *Id.*

Here, Plaintiffs do not allege their constitutional injuries are based on the anticipated enforcement of the CPA against conduct arguably proscribed by the statute. *See* Dkt. 43 ¶¶ 129–83. In fact, they have consistently disputed that the Attorney General ever had a legitimate basis for investigating potential CPA violations. *See id.* ¶¶ 5, 62, 79, 148, 166, 175; *see also, e.g.*, Dkt. 58 at 32 ("But all of those questions are irrelevant without answering one critical threshold question: *what was his evidence that the Obria Clinics may have violated the law*, such that he had a right to demand they produce their papers and effects in the first place?"). Plaintiffs' claims are instead predicated entirely on Defendant's past actions—opening an investigation and issuing CIDs. *See* Dkt. 43 ¶¶ 101–28. In their opposition brief, Plaintiffs argue only that the

CIDs, not the threatened enforcement of the CPA, "inflicted multiple constitutional harms."
Dkt. 58 at 21–24. Since Defendant's investigatory probe is the basis of Plaintiffs' complaint, the
Court applies the retaliatory framework to evaluate the First Amendment claims. *See Twitter*, 56
F.4th at 1175.[2]

  1. *Plaintiffs have not shown injury in fact as to their free speech claims.*

  Under the retaliatory framework, to satisfy the injury-in-fact element of standing for their
speech claims, Plaintiffs must make a sufficient showing that their speech has been chilled.
*Twitter*, 56 F.4th at 1174. Plaintiffs argue that the CIDs have chilled their speech in three ways.
Dkt. 58 at 23. First, they allege that although Obria PNW "has previously spoken about APR and
would like to more prominently publicize [its] availability to assist pregnant women who wish to
stop a chemical abortion," it "has not made any further public statements about APR due to fear
of reprisal" from the Attorney General. Dkt. 43 ¶¶ 119–20. Second, Plaintiffs contend that "but
for Defendant's investigation, Plaintiffs would prepare a brochure of materials on the safety and
efficacy of APR to be distributed on social media, at its clinics, and elsewhere." *Id.* ¶ 120. Third,
Plaintiffs assert that "Obria PNW has discontinued operating its own website" and "instead relies
upon the Obria Group to host a website listing its services." *Id.* ¶¶ 121–22.

  In his motion to dismiss, the Attorney General makes a factual challenge to Plaintiffs'
allegations that their speech was chilled by the CIDs, since Plaintiffs have kept their online
presence and have continued to make public statements about their views on the safety and
efficacy of APR. *See* Dkt. 44 at 12. The Attorney General presented evidence that even though

---

[2] Plaintiffs cite to *National Institute for Family and Life Advocates v. James* to argue that they
have Article III standing. No. 24-CV-514 (JLS), 2024 WL 3904870 (W.D.N.Y. Aug. 22, 2024).
But that case is inapplicable because it arises from a pre-enforcement challenge to the New York
Attorney General's civil enforcement action. *See id.* at *3. There is no such anticipated
enforcement action by the Attorney General here.

Obria Group now hosts Obria PNW's website, Obria PNW's site (https://obria.org/washington/) contains a drop-down menu through which the user can directly access a "FAQ" page providing information about APR. *See* Dkt. 45 at ¶¶ 5–7; Dkt. 45-3, 45-4. That FAQ page contains Plaintiffs' views on the health risks, success rate, and process for obtaining APR—the same speech Plaintiffs claim has been chilled by receipt of the CIDs. *See* Dkt. 45-4; *see also* "Abortion FAQs," https://obria.org/get-care/faqs/ (last visited on January 3, 2025). Plaintiffs' opposition does not dispute the facts contained in these exhibits. *See* Dkt. 58.

"When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof.'" *Leite*, 749 F.3d at 1121–22 (quoting *Hertz Corp. v. Friend*¸ 559 U.S. 77, 96–97 (2010)). "The plaintiff bears the burden of proving by a preponderance of evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* (citation omitted).

Plaintiffs have not met their burden. Although Plaintiffs filed a verified complaint, it contains only conclusory allegations that had the Attorney General not pursued his investigation, they would have distributed materials on the safety and efficacy of APR. *See* Dkt 58 at 23–24; Dkt. 43 ¶ 120. As the Attorney General's exhibits illustrate, regardless of the immaterial change in website host, Plaintiffs have continued speaking publicly about APR on their online platforms, communicating their views about the safety and efficacy of the procedure, and providing a telephone number where members of the public can seek referrals. *See* Dkt. 45-3, 45-4. Plaintiffs have neither rebutted this evidence nor affirmatively shown that it was "more likely than not" that the CIDs chilled their speech. *See San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1029 (9th Cir. 2023).

But even if Plaintiffs' allegations are accepted as true, their claimed self-censorship in response to the CIDs does not constitute chilled speech. *See Twitter*, 56 F.4th at 1175. In *Twitter*,

the Texas Office of the Attorney General served Twitter with a CID pertaining to its content moderation decisions. *Id.* at 1175. The Ninth Circuit concluded that Twitter did not suffer an injury in fact because the CID was not self-enforcing. *Id.* at 1176; *see Seattle Pac. Univ.*, 104 F.4th at 57 (reaffirming that "vague assertions of chilled speech were insufficient to establish an injury" because "[c]rucially, the CID was non-self-executing."). The court reasoned that "[p]re-enforcement, Twitter never faced any penalties for its refusal to comply with the CID. And enforcement is no rubber stamp." *Id.* To enforce the CID, the Texas Attorney General would need to serve Twitter with a petition for a state court order to enforce the CID, and the court could "conduct hearings to determine whether to order enforcement." *Id.* If the court ordered enforcement, Twitter could appeal to the Texas Supreme Court. *Id.* "[T]o complain about the CID in this posture is to speculate about injuries that have not and may never occur." *Id.* Moreover, "to the extent Twitter argues that any actions it has taken in response to the CID create an Article III injury, those injuries are self-inflicted because the actions were voluntary." *Id.*

The circumstances here are nearly identical to those in *Twitter*. Plaintiffs have not faced pre-enforcement penalties for declining to comply with any part of the CIDs. *See* Dkt. 58 at 13. To enforce the CIDs, the Attorney General would need to file and serve Obria with an enforcement petition; the state court then would have jurisdiction to hold hearings and decide whether to enforce the CIDs. RCW 19.86.110(9). The Attorney General has not brought such an action, and if he did, the court may modify or set aside the CIDs. The court might determine that Plaintiffs have already complied with the CIDs or it might agree with Plaintiffs that the CIDs are overbroad. If the state court *did* order enforcement, Plaintiffs could appeal to the state appellate courts.

Nor is this Court persuaded that the state court would simply "rubber stamp" the Attorney General's hypothetical petition. Washington state courts have demonstrated real willingness to enforce the limits of the Attorney General's authority in CPA actions, particularly when CPA claims are pursued in a way that threatens Constitutional freedoms. *See, e.g.*, *State v. TVI, Inc.*, 524 P.3d 622 (Wash. 2023) (holding the Attorney General's CPA claims infringed the defendant's First Amendment right to engage in charitable solicitation); *State v. TVI, Inc.*, No. 17-2-32886-3 SEA, 25 (Wash. Ct. Super. Oct. 17, 2023) (granting the defendant in same case approximately four million dollars in attorney's fees and rejecting the State's argument that such an award would deter the Attorney General from taking enforcement actions in difficult cases).

Plaintiffs analogize to *White v. Lee*, 227 F.3d 1214 (9th Cir. 2000). But that case is inapposite because (1) it does not address ripeness, and (2) in that case, the agency itself, without a court order, subjected organizations to a large fine for noncompliance with a subpoena, leaving the plaintiffs without an opportunity to challenge the investigation until the agency brought formal charges. *See id.; see also Twitter*, 56 F.4th 1177 (distinguishing *White* on these grounds). Here, the Attorney General would need to petition the state court to compel enforcement, and the court, not the Attorney General, could issue an enforcement order or impose sanctions for noncompliance. Plaintiffs would have the opportunity to challenge the CIDs at that point, before facing sanctions. *See* RCW 19.86.110(9).

Accordingly, as in *Twitter*, enforcement is merely hypothetical; the actions Plaintiffs have taken in response to the CIDs are "voluntary" and the resulting injuries are thus "self-inflicted." *Twitter*, 56 F.4th at 1176. The Attorney General here has no power to require Plaintiffs to do anything without going to court. Separately, when considering the evidence submitted by the Attorney General in this factual attack on jurisdiction—demonstrating that Plaintiffs' website continues to carry their message about Abortion Pill Reversal—the Court

finds that Plaintiffs have not met their burden to show by a preponderance of the evidence that their speech has in fact been chilled. *See* Dkt. 45-3, 45-4, 45-5; *San Diego Cnty. Credit Union*, 65 F.4th at 1028–29 ("If the factual basis for jurisdiction is disputed, the plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met.") (cleaned up). Plaintiffs have not suffered an injury in fact as to their First Amendment free speech claims.

　　　　2.　　　*Plaintiffs have not shown injury in fact as to their free association claims.*

　　　　Nor have Plaintiffs suffered an injury in fact as to their associational claims. Plaintiffs argue that Defendant's "demands for [] information in his deficiency letters while highlighting sanctions for non-compliance" is an "attempt at 'compelled disclosure' of sensitive internal information" that "is a per se harm to its protected associations." Dkt. 58 at 21. This argument is unpersuasive. Plaintiffs cite to *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021) and *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449 (1958) to support their claim of per se associational harm, but both cases are factually distinct from the circumstances presented here. *See* Dkt. 58 at 21.

　　　　In *Americans for Prosperity Foundation v. Bonta*, the Supreme Court invalidated a state law requiring charitable organizations to disclose to the Attorney General's Office the identities of their major donors. 594 U.S. at 601. When the plaintiffs refused to comply with the disclosure requirements, the Attorney General "threatened to suspend their registrations and fine their directors and officers." *Id.* at 603. The Supreme Court held that the "Attorney General's disclosure requirement impose[d] a widespread burden on donors' associational rights" and thus was "facially unconstitutional." *Id.* at 618. But there are two key differences between the blanket disclosure requirement in *Americans for Prosperity* and the CIDs challenged here.

First, unlike the CIDs issued by Defendant, the threat to suspend the charities'
registrations and fine the officers in *Americans for Prosperity* had teeth without a court as an
intermediary. *See id.* California law authorized the Attorney General to make regulations
regarding the registration and renewal process and granted the Attorney General the power to
revoke licenses for failing to comply with the rules. *See* Cal. Code Regs. tit. 11, § 312. But here,
Defendant cannot penalize Plaintiffs for non-compliance without successfully obtaining an order
from the state court. RCW 19.86.110(9). Second, this is not a facial challenge to the Consumer
Protection Act or the Attorney General's power to issue CIDs. Plaintiffs challenge instead the
Attorney General's exercise of his investigatory powers in their case—which is exactly what a
state court would review before Plaintiffs could be compelled to turn over their internal
documents. In *Americans for Prosperity* itself, the Court noted that the California Attorney
General retained his authority to seek the charities' records through an investigation. 594 U.S. at
614 ("[T]here are multiple alternative mechanisms through which the Attorney General can
obtain Schedule B information after initiating an investigation."). The hypothetical possibility
that Plaintiffs could be compelled to produce information after review of the CID by a state court
does not injure their associational rights in the way that the blanket, affirmative disclosure
requirement in *Americans for Prosperity* did.

Similarly, in *NAACP v. State of Alabama ex rel. Patterson*, the plaintiff adequately
alleged injury to its associational rights because it was held in contempt by a state court for
refusing to provide its membership lists. 357 U.S. at 452–54. But Plaintiffs here do not allege
they are facing a court action nor any other means of enforcement by Defendant to establish an
injury. *See* Dkt. 43. There is no analogous associational harm.

Plaintiffs next argue that the CIDs have damaged their relationships with their vendors.
Dkt. 58 at 22. Specifically, Plaintiffs assert that after receiving Defendant's CIDs,

1    "representatives from certain of these companies reached out to Plaintiffs and expressed their

2    dismay and displeasure about having to pay attorneys' fees after getting caught up in a

3    government investigation because of their association with Plaintiffs." Dkt. 43 ¶ 113. Plaintiffs

4    allege that as a result, they have not used the services of some of those organizations since. *Id.*

5    Plaintiffs' decision to stop using services from a vendor was a voluntary choice based on

6    speculation, and the resulting lost vendor relationship does not constitute injury. *See Twitter*, 56

7    F.4th at 1176 (because "the enforceability of the CIDs remains an open question," Twitter's

8    allegations of financial costs and employee time were "incurred . . . voluntarily in responding to

9    the CID"). Similarly, hearing the vendor's displeasure over the CIDs is not a concrete, legally

10   cognizable harm. *See Spokeo*, 578 U.S. at 340. Since all of Plaintiffs' alleged associational

11   injuries are either non-injurious or voluntary, they are not ripe for injunctive or declaratory relief.

12        3.    *Plaintiffs have not shown injury in fact as to their privilege claim.*

13        Plaintiffs have also not suffered an injury in fact as to their privilege claim. "[A] claim of

14   First Amendment privilege is subject to a two-part framework. The party asserting the privilege

15   must demonstrate . . . a prima facie showing of arguable first amendment infringement." *Perry v.*

16   *Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (cleaned up). "If [the plaintiffs] can make

17   the necessary prima facie showing, the evidentiary burden will then shift to the government . . .

18   [to] demonstrate that the information sought through the [discovery] is rationally related to a

19   compelling governmental interest . . . [and] the least restrictive means of obtaining the desired

20   information." *Id.* at 1161 (cleaned up).

21        As discussed above, *see* Sec. III.B.1–2, Plaintiffs' allegations of chilled speech and

22   associational harm do not establish a First Amendment injury in fact. Since Plaintiffs cannot

23   make the necessary *prima facie* showing of injury, their privilege claim is not ripe. *See Perry*,

24   591 F.3d at 1160.

4.  *Plaintiffs have not shown injury in fact as to their Fourth Amendment rights.*

Finally, Plaintiffs allege they have suffered injury in fact as to their Fourth Amendment right to be free from unreasonable searches and seizures. Dkt. 43 ¶¶ 168–183. Plaintiffs argue they have they have possessory rights over "the private, sensitive documents" that the Attorney General has demanded in the CIDs and deficiency letters, and which Plaintiffs have not yet produced. Dkt. 58 at 18. They claim that an injunction would spare Plaintiffs from further document production. *Id.* But because the CIDs are not self-enforcing, the threat of compelled production of Plaintiffs' private, sensitive documents is merely hypothetical, and any harm through Plaintiffs' pre-enforcement compliance with the CIDs is voluntary. *Twitter*, 56 F.4th at 1176. Plaintiffs claim that the CIDs violate their rights because they seek documents that are "unrelated to an investigation authorized by law." Dkt. 43 ¶ 169. But Plaintiffs can only be forced to turn over their documents after a judicial officer reviews the CIDs, hears any objections, and decides that the CIDs are enforceable. *See* RCW 19.86.110(3), (8), (9). Plaintiffs have not yet suffered an injury to their Fourth Amendment rights, and any hypothetical future injury is too speculative to confer standing under Article III.

**C.    Plaintiffs have not satisfied prudential ripeness.**

To determine prudential ripeness, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Irritated Residents*, 10 F.4th at 944 (quoting *Abbott Labs.*, 387 U.S. at 149). "The prudential considerations of ripeness are amplified where constitutional issues are concerned." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (citation omitted).

"A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009) (citation omitted). Courts consider "whether the []action is a

definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms." *Id.* (citation omitted). Generally, "pure legal questions that require little factual development are more likely to be ripe." *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, No. 23-35518, 2024 WL 4966057, at *9 (9th Cir. Dec. 4, 2024) (citation omitted).

To satisfy the hardship prong, "a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss." *Stormans*, 586 F.3d at 1126 (citation omitted). The hardship analysis "dovetails, in part, with the constitutional consideration of injury. Although the constitutional and prudential considerations are distinct, the absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship." *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1142 (9th Cir. 2000) (en banc).

Plaintiffs have not satisfied the fitness for decision prong. The claim here is unfit for decision because it rests on a hypothetical situation. *See id.* at 1141 ("[W]e do not decide constitutional questions in a vacuum.") (cleaned up). The Attorney General has not taken any enforcement action against Plaintiffs—to the contrary, as Plaintiffs acknowledge, the Attorney General has formally closed his investigation. *See* Dkt. 58 at 13. And as discussed extensively above, the CIDs do not have the force of law and are not binding on Plaintiffs. *See Stormans, Inc.*, 586 F.3d at 1126. Absent additional action from the Attorney General that would further develop the factual record, the claims are not fit for the Court to decide. *See id.*

Plaintiffs have not satisfied the hardship prong either. Nothing in the record suggests the Attorney General plans to petition to enforce the CIDs under RCW 19.86.110(9). And there is no criminal enforcement mechanism for this statute. Neither party has alleged sending or receiving

any other responses, deficiency letters, or other communication regarding the CIDs (other than

the closure letter) since June 2023, when Plaintiffs responded to the Attorney General's April

2023 deficiency letter. *See generally* Dkt. 43, 44, 58, 59. If the Attorney General reverses course

and files an enforcement petition, Plaintiffs can oppose enforcement and present their arguments

to the state court. *See* RCW 19.86.110(9). Thus, Plaintiffs have not alleged hardship that

"overcome[s] the uncertainty of the legal issue presented in the case in its current posture." *See*

*Colwell*, 558 F.3d at 1129 (citation omitted). Plaintiffs' claims are not prudentially ripe.

**D.    Obria PNW's increased insurance premium is not redressable.**

Plaintiffs allege that "Obria PNW received notice from its insurance agency that, as a

direct result of truthfully acknowledging on its application that it is presently subject to

Defendant's CIDs, the agency was unable to secure an underwriter to renew and extend an

essential insurance policy." Dkt. 43 ¶ 126. Though Obria PNW was able to obtain replacement

coverage, Plaintiffs assert that "because of the pendency of Defendant's CIDs, it was at a cost

more than seven times higher than the premiums for the same insurance coverage prior to the

commencement of Defendant's investigation." *Id.* ¶ 128.

"To establish redressability, a plaintiff must show that 'it is likely, as opposed to merely

speculative, that [its] injury will be redressed by a favorable decision.'" *Skyline Wesleyan*

*Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 749 (9th Cir. 2020) (quoting

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). "[I]t is

a bedrock principle that a federal court cannot redress 'injury that results from the independent

action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024)

(quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40–41 (1976)).  Because the

Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how

independent decisionmakers will exercise their judgment," the plaintiffs "must show that the

third-party [] 'will likely react in predictable ways' to the defendants' conduct." *Id.* at 57–58 (first quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); then quoting *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019)). When the plaintiffs seek forward-looking relief, they "must proffer evidence that the defendants' allegedly wrongful behavior w[ould] likely occur or continue." *Id.* at 69 (cleaned up).

In *Skyline Wesleyan Church*, the California Department of Managed Healthcare (DMHC) issued a directive informing seven insurers that under California law, they were required to remove restrictions on covering legal abortions from their plans effective immediately and submit revised plan documents reflecting the changes made. 968 F.3d at 744. Skyline Wesleyan Church then sued DMHC, asserting that because of the Department's directive, its insurer Aetna had removed references to abortion restrictions from its coverage documents. *Id.* Skyline alleged that since DMHC's directive was issued, it had not been able to obtain a plan in line with its beliefs about abortion. *Id.* at 745. While acknowledging that federal courts cannot redress injuries caused by the independent actions of a third party, the Ninth Circuit held that "a plaintiff does have standing when the defendant's actions produce injury through their determinative or coercive effect upon the action of someone else." *Id.* (internal quotations omitted). The Ninth Circuit reasoned, "DMHC's action of issuing the Letter had a 'determinative or coercive effect' on the seven insurers who received them" because the DMHC had "jurisdiction to approve (or disapprove) the terms of those insurer's offerings throughout California." *Id.* at 750.

In contrast, Plaintiffs here have not shown that it is likely that the injury to their private insurance rates would be redressed by a favorable decision enjoining the Attorney General from future enforcement of the CIDs. They merely speculate that a favorable decision would prevent or counteract an increase in their insurance rates. *See* Dkt. 58 at 16–17. The decisions of insurance companies to price their policies depend on many factors, and Plaintiffs have not

shown that the Attorney General issuing non-self-enforcing CIDs had a "determinative or coercive effect" over their insurers. *See Skyline Wesleyan Church*, 968 F.3d at 749–50. For example, unlike in *Skyline Wesleyan Church*, the Attorney General did not have the power to approve the terms of the insurer's plan, nor did he communicate a particular directive to the insurers; Obria PNW disclosed the CIDs as a part of its own application to renew coverage. Dkt. 43 ¶ 126; *see Skyline Wesleyan Church*, 968 F.3d at 749–50.

Finally, Plaintiffs have not presented evidence that the Attorney General's alleged wrongful behavior will likely continue. Plaintiff's last voluntary production of documents was made in June 2023 and there have been none requested since. Dkt. 43 ¶ 115; *see Murthy*, 603 U.S. at 69 (2024) ("But without proof of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants."). Plaintiffs have not demonstrated that the injunctive or declaratory relief they seek would alter their duty to disclose the CIDs or their insurance companies' evaluation of Plaintiffs' applications. Accordingly, Plaintiffs' claims based on their increased insurance premium are not redressable by an injunction against the Attorney General's office, and they therefore lack standing to pursue those claims.

**E.    Further leave to amend would be futile.**

Plaintiffs have not sought additional leave to amend, and the Court finds that further leave to amend would be futile. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Plaintiffs have amended their complaint three times, and there is no indication that they could allege additional facts at this time that would change the jurisdictional analysis.

1

## IV.    CONCLUSION

2

Plaintiff's claims arising from the hypothetical enforcement of the Attorney General's

3

CIDs are not constitutionally or prudentially ripe, and their claims arising from their increased

4

insurance premiums cannot be redressed by the injunctive relief they seek. The Court therefore

5

lacks jurisdiction over the claims. The Attorney General's motion to dismiss is GRANTED, and

6

the case is DISMISSED WITHOUT PREJUDICE. *Freeman v. Oakland Unified Sch. Dist.*, 179

7

F.3d 846, 847 (9th Cir. 1999) (dismissals for lack of jurisdiction should be without prejudice).

8

9

Dated this 3rd day of January, 2025.

10

11

12

Tiffany M. Cartwright
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24